[No. 51502–6.   En Banc.   October 30, 1986.]

THE STATE OF WASHINGTON, *Petitioner,* v. PETER JACOB HIEB III, *Respondent.*

98

*Norm Maleng, Prosecuting Attorney,* and *Rebecca J. Roe, Deputy,* for petitioner.

*Kim S. Wakefield* and *Eric J. Nielsen* of *Washington Appellate Defender Association,* for respondent.

GOODLOE, J.—Confrontation clause and harmless error issues are raised in this case involving a second degree murder conviction for the death of a 20–month–old child. We affirm the conviction.

In September 1982, Mildred Turner and her two children, 3–year–old Shawna and 16–month–old Addy Kay, moved in with the respondent Peter Hieb. Three months later, on December 13, 1982, Addy Kay died from head injuries suffered between December 6 and 10.

Her autopsy showed that during the prior 3 months she had sustained a broken collarbone, a broken rib, three broken bones in her right arm, a broken thigh bone, and had numerous bruises on her face, abdomen, and legs. The fractures and bruises were in various stages of healing, indicating that they had occurred at different times.

On December 15, 1982, the King County Prosecutor charged Hieb with second degree murder. In his omnibus

application, Hieb moved to have Shawna declared incompetent to testify. Evidently, this motion was never ruled upon. During the pretrial motions when the court asked whether Shawna would be a witness, the prosecutor replied she would not. Hieb also moved to exclude, as inadmissible hearsay, statements Shawna had made to King County Deputy Prosecutor Mary Kay Barbieri on December 11, 1982. However, Hieb made no argument that admission of Shawna's statements would violate his constitutional right to confront the witnesses against him.

The trial court ruled that Shawna's statements to Barbieri were admissible as excited utterances and as present sense impressions. The court also ruled that the State could present evidence of the bruises and broken bones Addy Kay had suffered in the last few months of her life.

Because of the issues before the court, the evidence presented at trial must be outlined in detail. In September 1982, Mildred Turner and her two children, 3-year-old Shawna and 16-month-old Addy Kay took up residence with Peter Hieb in an apartment in Des Moines, Washington. In mid-September, Addy Kay's face was covered with bruises. Peter told Mildred that Addy Kay had been hurt playing on a trampoline at a friend's house.

Shortly thereafter Shawna had a large bruise on her forehead. Peter told Mildred he had gotten mad at Shawna and thrown her on the bed. Because he threw her too hard, Shawna's head hit the wall, leaving an indentation in the wall. Mildred asked Peter not to discipline her children.

Later in October, Addy Kay had bruises on the right side of her face. Mildred assumed she had fallen out of bed. Addy Kay's maternal grandmother with Mildred's permission took her to the doctor on October 25. Later, during the week of October 25, Addy Kay was favoring her right arm. Another visit to the doctor's office revealed the arm was broken, and it was casted. More bruises appeared on Addy Kay's face and chest in mid-November.

During the first week of December, Peter took the cast off Addy Kay's arm. That same week, Addy Kay had a rope

burn mark around her neck. Peter told Mildred he had grabbed Addy Kay by her shirt.

Also, in early December, another incident occurred while Peter was vacuuming. Mildred left the room and heard Addy Kay cry out in pain. When she went to check on Addy Kay there was a new bruise on her cheek and temple. Peter said he had hit the love seat where Addy Kay was sitting while vacuuming.

On Thursday, December 9, 1982, Mildred noticed a dent in the closet door in the girls' room. That night Peter stayed with the children while Mildred went out with a girl friend in the evening. The neighbor upstairs testified she heard what she thought were doors slamming downstairs for about 45 minutes on that Thursday about 7:30 p.m. The next morning, Mildred noticed another dent in the wall in the girls' room. When asked, Peter said he didn't know how the dents had gotten there. Later he said they were caused by his throwing a ball against them.

On Friday, December 10, 1982, Addy Kay was favoring her arm again and was taken to the doctor. It was thought to be rebroken and was put in a soft cast. Addy Kay went to bed about 7 p.m. that night.

The next morning, December 11, 1982, Peter woke Mildred up at 5:45 a.m. saying Addy Kay's breathing wasn't right. They checked her, and Mildred had Peter turn Addy Kay on her side. They returned to bed. A few minutes later, they couldn't hear any breathing. The medics were called and Mildred began mouth–to–mouth resuscitation. Peter took Addy Kay's pillows from the room and replaced them with pillows from his bed. Addy Kay's pillow appeared to have blood on it.

Two firemen arrived first at 6 a.m. and were met and directed to the apartment by Peter. They entered a bedroom and found Mildred doing mouth–to–mouth resuscitation on Addy Kay. Addy Kay was not breathing and had no pulse. They began CPR. They noticed a large bruise on one side of her face and a soft cast on her right arm.

At approximately 6:10 a.m., two medics arrived and took

over. They testified that the child appeared pale and bluish at first and later they noticed blood in the child's airway, a scar mark on her neck and bruising over her body. After 30 to 40 minutes, they were able to get blood pressure and a full heart rate. Around 7 a.m., they took the child to Harborview Medical Center. Addy Kay was later transferred to Children's Orthopedic Hospital. Two days later on December 13, 1982, at about 1 p.m. Addy Kay was pronounced dead.

Because of the injuries, the police had been called to the apartment by the emergency personnel. One officer, Kenneth Schnorr, testified that he noticed the child was bruised on her face and right leg, and that there were dents and blood splatters on the bedroom wall. He described the dents as "approximately five feet up [from the floor] and probably three to four inches across and maybe a quarter of an inch indentation into the wall, [with] cracks going out the plasterboard from the center of the indentation." Report of Proceedings I, at 79. He also noticed a blood-stained pillow in the adults' bedroom.

The children's baby–sitter at day care and a mother of another child at the same day care testified to the progression of bruises and injuries noticed on the children.

Doctor Harry Bonnell, assistant King County Medical Examiner, Dr. David Brewer, Pediatric Radiologist at Children's Orthopedic Hospital, and Dr. Bruce Beckwith, Director of Pathology at Children's Orthopedic Hospital, testified for the State about various injuries discovered at the autopsy. Addy Kay's arms, legs, face, chest, and abdomen had multiple bruises of multiple ages. She also had several fractured bones in various states of healing. They were: (1) a right leg fracture which was 1 to 3 weeks old; (2) two healing fractures of the right forearm of differing age; (3) a fresh fracture of the upper right arm which was at most 5 days old; (4) an older healing fracture of the collarbone which was 3 to 6 weeks old; and (5) a rib fracture which was 2 to 3 weeks old.

Addy Kay also had a hemorrhage in the mesentery in the

abdomen which was at most 90 hours old and an avulsion of the upper lip which was at most 5 days old. An avulsion is when the lip tears away from the gum. Both of these injuries are caused by severe blunt trauma.

Dr. Brewer also testified that in particular the fractures of the humerus (upper right arm), femur (right leg), and rib were indicative of child abuse, because they involve the strongest bones in the body and these bones seldom injure accidentally. All three doctors testified that the number and severity of injuries inflicted at different times over approximately 2 months led to the inescapable conclusion of child abuse.

According to Doctors Bonnell and Beckwith, the cause of death was subdural hematoma. Subdural hematoma occurs by violent shaking or by a blow to the head. The injury was 4 to 7 days old from the time of death. Indicative of what could cause a subdural hematoma would be a free fall from at least a distance of 10 or 12 feet onto a hard surface, such as a concrete or linoleum floor. It requires a very serious blow, not a corrective slap.

Mary Kay Barbieri was allowed to testify about her conversation with Shawna in the afternoon of December 11, 1982, after Addy Kay had been taken to the hospital. When Barbieri arrived, Shawna was withdrawn and wary. Her affect changed during the conversation at times becoming very agitated, angry, and visibly upset. Their conversation began with them playing with Legos. They built a house and Barbieri asked Shawna who she lived with. Shawna replied, "[M]ommy and Peter [Hieb]." Report of Proceedings I, at 91. Barbieri then asked whether Addy Kay lived there too. Shawna erupted, saying: "'Addy Kay is dead. Peter did this,' and made hitting motions to her abdomen. 'He put a pillow on her face.'" Report of Proceedings I, at 92. When Barbieri then asked Shawna what Peter had done, Shawna "just became extremely agitated and started hitting the Legos that were on the counter, just knocking them around and destroying our little house that we had built." Report of Proceedings I, at 92. After playing with

Shawna for a while to calm her down, Barbieri asked Shawna whether she had been watching when Addy Kay got killed. Shawna said, "Yes, but I shutted my eyes so Peter wouldn't see me." Report of Proceedings I, at 93. Pressed further, Shawna again became agitated. Barbieri then gave Shawna some dolls, a Peter doll and an Addy Kay doll, to use to show what had happened. Shawna became upset, pushed the "Peter doll" away, picked up the "Addy Kay doll," and "just started going, 'Bad doll, bad girl, bad girl,' and went through a tirade of hitting the doll [and] throwing the doll on the floor . . ." Report of Proceedings I, at 94–95. When Shawna calmed down again, Barbieri asked her whether Hieb had ever hurt her. Shawna smiled and replied, "No. I am good". Report of Proceedings I, at 95. When asked whether Peter ever hurt Addy Kay, she said: "All the time." Report of Proceedings I, at 95. Shawna also denied that her mother had ever hurt either her or Addy Kay. When reminded that Addy Kay had a broken arm, Shawna said, "Peter did that." Report of Proceedings I, at 95. Shawna did not testify at trial.

The jury found Hieb guilty of second degree murder. The trial court imposed a sentence of life imprisonment.

Hieb appealed to Division One of the Court of Appeals and argued, along with other issues, that he had been denied his constitutional right of confrontation by the admission of Barbieri's testimony of the statements made by Shawna without Shawna being shown to be unavailable. The Court of Appeals split on this issue. *State v. Hieb,* 39 Wn. App. 273, 693 P.2d 145 (1984). Judge Ringold's lead opinion found that some of the statements were inadmissible hearsay and that admitting the statements violated Hieb's constitutional right to confront the witnesses against him. The lead opinion further held that the confrontation clause issue could be initially raised on appeal, and that admitting Shawna's statements without requiring the State to either call her as a witness or prove she was unavailable was a confrontation clause error which required automatic reversal. Judge Callow concurred in the result only, finding

reversal was required by this court's decision in *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984). Judge Williams dissented on this issue, finding it would be unconscionable to apply the unavailability factor under the circumstances. He felt defense counsel had consented to her not being there and had waived the confrontation clause issue by acknowledging that Shawna would not be called as a witness and not requesting her presence or objecting to the testimony on the grounds she was not present.

The State petitioned this court for review, arguing only that Hieb was precluded from raising the alleged confrontation clause violation due to Shawna's unavailability for the first time on appeal because Hieb did not object on this ground at trial. In granting review, this court asked the parties to additionally address and argue the applicability of harmless error analysis in this case.

We must address three issues in this case. They are:

1. Can an alleged confrontation clause violation, due to hearsay being admitted without the State showing the declarant is unavailable, be raised initially on appeal?

2. Can an alleged confrontation clause violation due to the admission of hearsay evidence without the showing of unavailability ever constitute harmless error?

3. Was admission of such testimony harmless error in this case?

We answer all three questions in the affirmative and affirm the conviction.

The State argues that Hieb should not have been allowed to raise his confrontation clause challenge for the first time on appeal. The United States and Washington constitutions afford a criminal defendant the right to confrontation. The United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ." U.S. Const. amend. 6. The Washington constitution provides: "In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . ." Const. art. 1, § 22 (amend. 10). The federal confrontation right is

applicable to the states through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965). Hieb's confrontation clause challenge was based on hearsay being admitted without the declarant, Shawna, being shown to be unavailable.

Initially, it must be noted that not all of Barbieri's testimony can be characterized as hearsay. Her testimony of her observations of Shawna's demeanor and Shawna playing with the toys is not hearsay. *In re Penelope B.,* 104 Wn.2d 643, 652, 709 P.2d 1185 (1985). Much of Barbieri's testimony, however, did consist of hearsay, which is defined as an out–of–court utterance, writing or nonverbal conduct made by the declarant as an assertion and offered as evidence to prove the truth of the matter asserted. ER 801; *In re Penelope B., supra.*

The Court of Appeals lead opinion only focused on three statements related by Barbieri. These three statements clearly qualified as hearsay. The Court of Appeals found the statement about Addy Kay being dead and Peter hitting Addy Kay in the stomach and putting a pillow on her face was admissible hearsay as an excited utterance pursuant to ER 803(a)(2). It found Shawna's statements in response to questions about the past treatment of the children by Peter and Mildred, and the cause of Addy Kay's broken arm were inadmissible hearsay. *See In re Penelope B.,* at 657. Neither side has appealed these determinations. The testimony includes both admissible and inadmissible hearsay.

Hieb is incorrect in arguing that admission of any hearsay violates his constitutional rights to confront and cross–examine witnesses. The confrontation clause has never been construed to exclude all hearsay. *Dutton v. Evans,* 400 U.S. 74, 80, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970).

Although overlapping, the confrontation clause protections and hearsay requirements are *not* identical. The United States Supreme Court has

> more than once found a violation of confrontation values even though the statements in issue were admitted under

an arguably recognized hearsay exception. The converse is equally true: merely because evidence is admitted in violation of a long–established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied.

(Citations and footnote omitted.) *California v. Green,* 399 U.S. 149, 155–56, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970). The mere fact then that the testimony included admissible and inadmissible hearsay does not determine whether the confrontation clause rights were violated. *See State v. Boast,* 87 Wn.2d 447, 453, 553 P.2d 1322 (1976).

At the time of trial, unavailability of the declarant was a recognized factor for supporting a determination that confrontation clause rights were not violated. When this case was heard, *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980) was the seminal case tackling the interfacing of the confrontation clause and the admissibility of hearsay. The Court outlined a 2–part test to be used for determining when hearsay could be admitted without violating the confrontation clause.

In sum, when a hearsay declarant is not present for cross–examination at trial, the Confrontation Clause *normally* requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

(Footnote omitted. Italics ours.) *Roberts,* at 66. This court has applied the same 2–part test. *See State v. Parris,* 98 Wn.2d 140, 654 P.2d 77 (1982); *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984); *State v. Ryan,* 103 Wn.2d 165, 691 P.2d 197 (1984); *State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985); *State v. Terrovona,* 105 Wn.2d 632, 716 P.2d 295 (1986).

While *Ohio v. Roberts, supra,* stated that unavailability is *normally* required (*Roberts,* at 66), it noted that unavailability is not necessarily required. *Roberts,* at 65 n.7.

*Accord, Dutton v. Evans, supra; Boast,* at 455.

All of our cases listed the unavailability factor. Some decisions did not need to and therefore did not analyze the unavailability factor. *State v. Parris, supra; State v. Terrovona, supra.*

Other decisions, however, did focus on the unavailability factor. In *State v. Ryan, supra,* unavailability was found to be required by both the right of confrontation, and RCW 9A.44.120, the child sexual abuse evidentiary statute which requires a trial court determination of unavailability. In *State v. Dictado, supra,* a case addressing the admission of a coconspirator's statements, the court stated: "Unless the declarant is legally unavailable, the defendant's right to confront accusers is paramount to the State's need for the hearsay testimony." *Dictado,* at 287; *see Ryan,* at 172. The United States Supreme Court recently rejected this position. *United States v. Inadi,* ___ U.S. ___, 89 L. Ed. 2d 390, 106 S. Ct. 1121 (1986). It found legal unavailability was not required to be shown before admission of coconspirator statements and sharply limited the accepted pervasiveness of the *Ohio v. Roberts* unavailability factor. In *Inadi,* the Court of Appeals had interpreted *Roberts* to espouse a clear constitutional rule that "no out-of-court statement would be admissible without a showing of unavailability." *Inadi,* 106 S. Ct. at 1125. The Court rejected this position. It held that

> *Roberts,* however, does not stand for such a wholesale revision of the law of evidence, nor does it support such a broad interpretation of the Confrontation Clause. . . .
>
>   . . .
>
>   . . . *Roberts* cannot fairly be read to stand for the radical proposition that no out-of-court statement can be introduced by the government without a showing that the declarant is unavailable.

*Inadi,* 106 S. Ct. at 1125–26. The Court limited the *Roberts* decision to the specific question presented in *Roberts,* of the propriety of admitting preliminary hearing testimony, and found unavailability was not a prerequisite to the

admission of a coconspirator's statements.

■ Because of our ultimate holding that admission of the hearsay in this case was harmless error, we do not decide whether a showing of unavailability is required before hearsay can be admitted in a criminal trial. The State did not challenge the necessity of showing unavailability but only argued about when the unavailability factor had to be raised. However, because unavailability of the declarant was a recognized factor in a constitutional confrontation clause claim, the Court of Appeals correctly allowed Hieb to raise it initially on appeal. RAP 2.5(a)(3). "[I]t is an established principle of law that constitutional claims may be heard for the first time on appeal." *State v. McCullum,* 98 Wn.2d 484, 487, 656 P.2d 1064 (1983); *see Dictado,* at 287.

■ While the Court of Appeals lead opinion was correct in allowing the constitutional challenge to be raised for the first time on appeal, it was incorrect in determining that a confrontation clause violation requires automatic reversal. A confrontation clause violation may constitute harmless error.

The Court of Appeals lead opinion stated:

> The [confrontation clause] error requires automatic reversal, *Bagley v. Lumpkin,* 719 F.2d 1462, 1464 (9th Cir. 1983), because the denial of this right is "constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Davis v. Alaska,* 415 U.S. [308 (1974)] at 318.

*State v. Hieb,* 39 Wn. App. 273, 282, 693 P.2d 145 (1984). We recently reached a contrary conclusion in *State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985), where we stated: "It is well established that constitutional errors, including violations of a defendant's rights under the confrontation clause, may be so insignificant as to be harmless." *Guloy,* at 425, citing *Harrington v. California,* 395 U.S. 250, 251–52, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969); *Chapman v. California,* 386 U.S. 18, 21, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065, *reh'g denied,* 386 U.S. 987

(1967). Other cases have specifically allowed a harmless error test to be applied when the confrontation clause violation is due to admission of hearsay. *See Brown v. United States,* 411 U.S. 223, 230–31, 36 L. Ed. 2d 208, 93 S. Ct. 1565 (1973); *Schneble v. Florida,* 405 U.S. 427, 430, 31 L. Ed. 2d 340, 92 S. Ct. 1056 (1972); *State v. Braun,* 82 Wn.2d 157, 165, 509 P.2d 742 (1973); *United States v. Jarrad,* 754 F.2d 1451, 1457 (9th Cir. 1985); *United States v. Bibbero,* 749 F.2d 581, 584 (9th Cir. 1984); *United States v. Massa,* 740 F.2d 629, 640 (8th Cir. 1984).

The Court of Appeals reliance on *Bagley v. Lumpkin,* 719 F.2d 1462 (9th Cir. 1983) and *Davis v. Alaska,* 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974) in this case is misplaced because neither *Bagley* nor *Davis* involved a confrontation clause violation based on the admission of hearsay. *Bagley,* recently reversed by the United States Supreme Court, dealt with the prosecutor's failure to answer a *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963) request which may have provided impeachment evidence. *United States v. Bagley,* 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985). In its opinion, the United States Supreme Court found the Ninth Circuit's "reliance on *Davis* v. *Alaska* for its 'automatic reversal' rule is misplaced." The Court clarified that the *Davis* holding prohibits "direct restriction on the scope of cross–examination" of a crucial prosecution witness. *United States v. Bagley,* 473 U.S. at 678. More recently, the United States Supreme Court held that even a *Davis* confrontation clause violation is subject to review for harmless error. *Delaware v. Van Arsdall,* ___ U.S. ___, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986). The Court outlined factors to review whether the limitation of cross examination in a particular case was harmless error. *Delaware v. Van Arsdall, supra.*

We take this opportunity to reaffirm our decision that a violation of the confrontation clause by the admission of hearsay evidence may constitute harmless error.

Having determined that this type of confrontation clause violation may be harmless error, we must decide whether it

was harmless error in this case. In *Guloy,* after announcing that a confrontation clause error could be deemed harmless, we adopted and applied the overwhelming untainted evidence test to analyze the error.

> Under the "overwhelming untainted evidence" test, the appellate court looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. . . . The "overwhelming untainted evidence" test allows the appellate court to avoid reversal on merely technical or academic grounds while insuring that a conviction will be reversed where there is any reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict.

(Citations omitted.) *Guloy,* at 426.

In making our determination, we will review the entire record. *United States v. Hasting,* 461 U.S. 499, 509, 76 L. Ed. 2d 96, 103 S. Ct. 1974 (1983). First, we must eliminate the tainted evidence which is the inadmissible Barbieri hearsay testimony. The Court of Appeals determined and no party has appealed that Shawna's statements about the past treatment of Addy Kay and Shawna by Peter and Mildred and the cause of Addy Kay's broken arm were inadmissible. We did not consider this evidence. Additionally, we did not consider Shawna's response to Barbieri's question about whether she was watching when Addy Kay was killed. Shawna responded: "Yes, but I shutted my eyes so Peter wouldn't see me." Report of Proceedings I, at 93. This statement was not an excited utterance, was in response to a direct question, and was offered to prove the truth of the matter asserted. While it may be admissible testimony under another hearsay exception, in fairness to the defendant, we have not considered it.

We have considered all the other testimony.

We reviewed Hieb's out–of–court statements that Addy Kay had caused some of her injuries by hitting herself in the head with her cast and that the dents in the walls in Addy Kay's room had been caused by his bouncing a rubber ball off the walls. The injuries suffered by Addy Kay

were not injuries which could have been self–inflicted by a 16– to 19–month–old child. The presence of blood in the dents in the walls, the size of the dents, and the presence of bruises on the child's scalp clearly indicate that the dents were caused by Addy Kay's head, not by a rubber ball.

We reviewed the neighbor's testimony that 4 days before Addy Kay was pronounced dead, she heard what sounded like doors slamming for 45 minutes in Peter's apartment. Peter had been alone with the children that night.

We reviewed the testimony presented by other witnesses of the occurrence and continuation of physical abuse to the children after they and their mother moved in with Peter. We reviewed Barbieri's testimony of Shawna's behavior with her and with the dolls during their interaction. We found no evidence or even allegations implicating Mildred. We also reviewed Shawna's admissible hearsay communication to Barbieri that Peter hit Addy Kay in the stomach and put a pillow over her face. While these acts were not necessarily the cause of Addy Kay's death, Peter's having performed them is circumstantial evidence that he also was the perpetrator of the fatal abuse inflicted on Addy Kay.

Hieb was charged with committing second degree murder in either of two ways: intentionally killing the child or knowingly causing grievous bodily harm which ultimately resulted in her death. The State could prove the charge by direct or circumstantial evidence. The jury was given WPIC 5.01, which provides:

> Evidence may be either direct or circumstantial. Direct evidence is that given by a witness who testifies concerning facts which he or she has directly observed or perceived through the senses. Circumstantial evidence consists of proof of facts or circumstances which, according to common experience permit a reasonable inference that other facts existed or did not exist. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. One is not necessarily more or less valuable than the other.

Instruction 5. Clerk's Papers, at 11.

We hold overwhelming circumstantial evidence indicates

112

the defendant's guilt. We affirm the conviction.

DOLLIVER, C.J., UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, and DURHAM, JJ., and CUNNINGHAM, J. Pro Tem., concur.