# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　Respondent,<br><br>　　　v.<br><br>WEI WANG,<br><br>　　　　　　Appellant. | DIVISION ONE<br><br>No. 80565-7-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Wei Wang appeals from the judgment entered on a jury's verdict finding him guilty of assault in the first degree with a deadly weapon enhancement. He contends that the trial court erroneously admitted evidence, that the exclusion of immigration evidence denied him the opportunity to present a defense, and that insufficient evidence supported both his conviction and the deadly weapon enhancement. Finding no error, we affirm.

I

In 2017, Wei Wang and Zhen Wang were a married couple living together in Shoreline. They lived with one of Zhen's daughters from a previous marriage and their young son. Zhen's parents, Xiamin Yu and Wenxiang Wang, also lived in Shoreline, in a condominium. Zhen's mother, Yu, would often go to Wang and Zhen's house to care for the children.

On several occasions, while the couple was arguing, Wang physically abused Zhen. In June 2017, after Wang restrained and slapped Zhen, he

threatened to kill Zhen and her family if she reported the incident. Zhen sought medical treatment but did not report that Wang had hit her. In August 2017, during another argument, Wang hit the back of Zhen's head while he restrained her on their bed. After Wang released her, Zhen ran from the room and called the police. Wang fled but was arrested upon his return to the house.

After his arrest, a no-contact order prohibited Wang from having any contact with Zhen. However, upon Zhen's request, Yu bailed Wang out of jail. Despite the no-contact order, Wang returned to the home he shared with Zhen and slept in a spare room while she remained in the master bedroom.

The night of September 13, 2017, Wang and Zhen argued and discussed divorce. Yu was staying over to help Zhen with the children. The next morning, Zhen woke up late and had to rush to take her daughter to school. Realizing that she had forgotten her wallet, Zhen returned home immediately after dropping her daughter off. She had been out of the home for approximately 15 minutes.

When Zhen arrived home, the family's second car was missing. Upon entering the house, she found blood and broken objects strewn throughout the living room, hall, and bathroom. Zhen heard Yu calling for her and found her in a bedroom, lying on the floor in a pool of blood. Yu's head was knocked in on the left side, she had a large laceration on her face, and several of her teeth had been knocked out. Yu was largely unable to move or speak.

Zhen telephoned 911 for help. On the phone with the 911 dispatcher, Zhen repeatedly exclaimed that her mother's blood was everywhere and pleaded for help. Zhen told the 911 operator that she could see "through [Yu's] skull" and

2

could see her mother's "brain stuff coming out." The 911 operator instructed Zhen to use a towel to apply pressure to Yu's wound. While Zhen was applying pressure to Yu's head wound, Yu communicated to her by moving a finger that Wang had caused her injuries. Yu relayed this information by telling the operator, "[S]he said my husband come over here and kill her." Zhen went on to provide Wang's name and the license plate of the missing family vehicle. She told a second operator that Wang had attacked Yu, repeating "I know it's him. It's him. He killed my mom. He killed my mom." Zhen told the operator she had a protection order against Wang. Zhen then asked the operator to protect her father at the condominium because Wang would "go over there and kill my dad." Zhen then pleaded for help until the paramedics arrived.

Yu suffered a fractured skull, brain contusions, head and facial fractures, lacerations to her scalp and face, and teeth avulsions. Yu's skull was eventually reconstructed with titanium mesh. Because of the brain damage she suffered, Yu has no memory of what occurred after Zhen left the house on September 14.

On September 15, Wang was apprehended in the family car in a motel parking lot in Beaverton, Oregon. Wang had lacerations on his torso, head, neck, hands, shin, and penis. He was charged with one count of first degree assault and one count of attempted first degree premeditated murder. For both counts, the State alleged that Wang was armed with a deadly weapon—a chair— and alleged a domestic violence relationship between Wang and the victim.

At trial, Wang testified as follows. On the morning of September 14, he tried to retrieve his cell phone and bank cards from the master bedroom but Yu

3

blocked his passage and refused to let him enter. According to Wang, when he tried to push Yu out of the way, she grabbed and scratched him before grabbing and squeezing his penis. This caused Wang concern that Yu would seriously injure him. As a result, he picked up a wooden stool and hit her body and arm. Yu then released his penis from her grip but followed Wang to a bathroom, where she again grabbed and squeezed his penis. Yu then attempted to bite Wang's penis and he hit her in the mouth with a plastic step stool. Again, Yu let go of Wang's genitals and Wang exited the bathroom. However, Yu continued to follow Wang into a small bedroom where the two fought over a wooden stool, which caused the stool to break. Wang testified that the stool "might have hit her head" during the struggle. Eventually, Yu let go of the stool. Yu told Wang that Zhen would be back in a minute. Wang walked into the master bedroom and took his cell phone and bank card, as well as other items including Yu's cell phone, and Zhen's forgotten wallet, and left the house.

The trial court admitted evidence of Zhen's 911 call as consisting of present sense impressions or excited utterances.[1] The trial court excluded evidence of the family's immigration status.[2] The jury convicted Wang of assault in the first degree and found both the deadly weapon enhancement and the domestic violence relationship by special verdicts. The jury acquitted Wang of attempted murder in the first degree.

---

[1] Prior to trial, the trial court indicated that the statements were admissible under both the excited utterance and present sense impression exceptions to the hearsay rule. During trial, the trial court ruled that the entire call was admissible as consisting of excited utterances.

[2] Wang, Zhen, and her parents are all originally from China. Zhen is a United States citizen.

Wang appeals.

II

Wang contends that the trial court erred in admitting the recording of Zhen's 911 call. This is so, he asserts, because "Zhen's statement to the 911 operator did not qualify as either a present sense impression or an excited utterance because Zhen consciously and deliberately fabricated a portion of her story." We disagree.

We review a trial court's determination that a hearsay exception applies for an abuse of discretion. State v. Magers, 164 Wn.2d 174, 187, 189 P.3d 126 (2008). An abuse of discretion occurs, in an evidentiary sense, when the trial court's ruling is manifestly unreasonable or based on untenable grounds or reasons. State v. Garcia, 179 Wn.2d 828, 844, 318 P.3d 266 (2014). We may affirm the trial court on "any correct ground." State v. Gresham, 173 Wn.2d 405, 419, 269 P.3d 207 (2012).

Pursuant to ER 803(a)(2), "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" may be admissible as an exception to the hearsay rule.

> This exception is based on the idea that "under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control." The utterance of a person in such a state is believed to be "a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock," rather than an expression based on reflection or self interest.

State v. Chapin, 118 Wn.2d 681, 686, 826 P.2d 194 (1992) (citation omitted) (quoting 6 JAMES HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 1747, at 195 (1976)).

A statement qualifies as an excited utterance if (1) a startling event occurred, (2) the declarant made the statement under the stress or excitement of the event, and (3) the statement relates to the event. Magers, 164 Wn.2d at 187-88. Accordingly, when there is evidence that a declarant has intentionally fabricated statements, those statements are not excited utterances. State v. Brown, 127 Wn.2d 749, 757-58, 903 P.2d 459 (1995).

A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." ER 803(a)(1). "The admissibility of a statement of a present sense impression is based upon the assumption that its contemporaneous nature precludes misrepresentation or conscious fabrication by the declarant." State v. Hieb, 39 Wn. App. 273, 278, 693 P.2d 145 (1984), overruled on other grounds, 107 Wn.2d 97, 727 P.2d 239 (1986).

The recording of the 911 call contains two levels of hearsay. During the call, Yu communicated to her daughter, Zhen, by wiggling her finger when Zhen asked her if Wang had done this to her, creating one level. Zhen then repeated this to the 911 operator, creating a second level of hearsay. Prior to trial, the court addressed both levels of hearsay, considered both the present sense impression and excited utterance exceptions to the hearsay rule, and ruled that the statements were admissible pursuant to either exception. During trial, the

court ruled that all of the statements on the call were admissible as excited utterances.

On appeal, Wang challenges the admissibility of Zhen's statements to the 911 operator. Wang asserts that Zhen's statements to the 911 operator cannot have been made while Zhen was still under the stress of a startling event because she "blatantly lied" by telling the 911 operator that Wang had "come over" to the house when, in fact, Wang had been living at the house.

Zhen initiated the 911 call at issue immediately after finding her mother badly injured and lying in a pool of her own blood. Zhen yelled to the operator that there was "blood everywhere" and repeatedly exclaimed that she needed help. To proceed with the call, the 911 operator had to ask Zhen to "[s]top talking and answer [the operator's] questions." These initial statements were excited utterances. Zhen discovered her badly injured mother, and while under the stress of that startling event, made statements related to that event.

As the call continued, the operator began to ask Zhen questions about Yu's condition and instructed her to use a towel to apply pressure to Yu's head wound. Zhen described Yu's current condition and her own actions as she held the towel to Yu's head. Anticipating that the operator would inquire into the mechanism of the injury, Zhen communicated with her mother using Chinese and hand gestures. Zhen then described to the operator what she believed Yu had communicated to her saying, "[S]he said my husband come over here and kill her." These statements were present sense impressions. Zhen uttered the statements describing her mother's condition and explaining her mother's

communication immediately after she perceived it. The trial court had no reason to believe that Zhen was fabricating or misrepresenting Yu's statements to her, nor any reason to believe that Yu had lied to Zhen.[3] Cf. Brown, 127 Wn.2d at 758 (trial court erred in admitting evidence of victim's 911 call after victim had testified that she had decided to lie to the police prior to making the call).

The trial court correctly ruled that Zhen's statements during the call fell within recognized exceptions to the hearsay rule. Her initial statements were excited utterances. The additional information she provided to the 911 operator describing Yu's condition and explaining Yu's communications were present sense impressions. Wang's argument to the contrary fails.

III

Next, Wang asserts that the trial court's decision to exclude evidence of his own and family members' respective immigration statuses infringed upon his right to present a defense. We disagree.

Our Supreme Court has explained that a contention that an evidentiary ruling violated a defendant's constitutional right to present a defense is reviewed pursuant to a two-step process. State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). First, we review the challenged evidentiary rulings under an abuse of discretion standard. Then, if necessary, we review de novo whether

---

[3] Zhen later testified that she lied to responding officers when they arrived at the house by telling them that Wang had been living with her father and had come to the house to attack her mother. The trial court had not yet heard this testimony when the evidentiary rulings at issue were made. Furthermore, Zhen's later decision to lie about where Wang had been staying does not establish that she misrepresented her mother's communication during the 911 call. More to the point, we focus on the information before the trial judge at the time of the challenged ruling. Wang never sought reconsideration of that ruling after Zhen testified about later deceiving the police. Thus, the fact is immaterial to our resolution.

such rulings violate a defendant's constitutional right to present a defense. See Arndt, 194 Wn.2d at 797-812.

Here, Wang does not contend that the trial court's ruling regarding immigration status violated the applicable rule of evidence.[4] Hence, we proceed directly to considering whether it violated his right to present a defense.

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). "A defendant's right to an opportunity to be heard in his defense, including the rights to examine witnesses against him and to offer testimony, is basic in our system of jurisprudence." State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (citing Chambers, 410 U.S. at 294). However, defendants have "no constitutional right to present *irrelevant* evidence." Jones, 168 Wn.2d at 720.

When determining whether the right to present a defense has been violated, "the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted." Arndt, 194 Wn.2d at 812. It would violate a defendant's right to present a defense to bar the admission of evidence that, "if excluded, would deprive defendants of the ability

---

[4] Immigration evidence in a criminal case is governed by ER 413(a). When immigration status is an essential element of, or a defense to, a criminal charge, it is admissible regardless of its potential for prejudice. When immigration status is offered to show bias or prejudice, it is admissible when, following a procedure laid out in ER 413(a)(1)-(4), the trial court determines that its "probative value outweighs the prejudicial nature of evidence of immigration status." ER 413(a)(4). In all other instances, immigration evidence is presumptively inadmissible. State v. Bedada, 13 Wn. App. 2d 185, 198, 463 P.3d 125 (2020). Wang did not file a pretrial motion including an offer of proof of relevancy of the proposed evidence, as is required by ER 413(a), to offer immigration status to show bias or prejudice of a witness.

to testify to their versions of the incident." Jones, 168 Wn.2d at 721. However, a trial court may bar the admission of evidence that, if excluded, would not completely bar a defendant from offering relevant evidence that would enable the defendant to present the defense theory of the case to the jury. See Arndt, 194 Wn.2d at 814 (concluding that Arndt's right to present a defense was not violated in a murder and arson case when only some of her proffered evidence was excluded and she was able to argue her defense theory).

Here, Wang contends that evidence of the family's immigration status was necessary to his self-defense claim because it explained the family's power dynamics in order to "counter" the State's narrative that he was an abusive husband. Specifically, he asserts that because, of the family members, only Zhen was a United States citizen, she had power over both her parents and him.

However, the record establishes that Wang was permitted to, and did, in fact, argue his theory to the jury that he acted reasonably in self-defense.[5] Immigration status evidence was not necessary for Wang to testify that his mother-in-law grabbed and squeezed his genitals and that he was afraid he would suffer serious harm.

Because Wang was allowed to proffer sufficient evidence to argue his defense theory to the jury, and did, in fact, argue his theory to the jury, his right to present a defense was not violated. See Arndt, 194 Wn.2d at 813-14 (concluding that there was no violation of Arndt's right to present a defense

---

[5] In his next claim of error, Wang contends on appeal that the record "establishes" that Wang acted reasonably in self-defense. This argument would be impossible had Wang not had the opportunity to present evidence of his theory.

because Arndt was able to advance her defense theory through the presentation of some, though not all, of her proposed supporting evidence).

IV

Wang contends that the State failed to prove beyond a reasonable doubt that he had the requisite intent to inflict great bodily harm. We disagree.

Due process requires that the State prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). To determine whether sufficient evidence supports a conviction, an appellate court must "view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Homan, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Salinas, 119 Wn.2d at 201. Additionally, an appellate court "must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence." Homan, 181 Wn.2d at 106.

To prove first degree assault as charged, the State was required to establish that Wang assaulted Yu with the intent to inflict great bodily harm and that the assault resulted in great bodily harm. Former RCW 9A.36.011(1)(c) (1997).[6] Wang raised a self-defense claim, shifting the burden to the State to

---

[6] The version of RCW 9A.36.011 in effect at the time is cited. RCW 9A.36.011 was amended effective June 11, 2020.

prove the absence of self-defense beyond a reasonable doubt. State v. Walden, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997).

"Evidence of self-defense is evaluated 'from the standpoint of the reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees.'" Walden, 131 Wn.2d at 474 (quoting State v. Janes, 121 Wn.2d 220, 238, 850 P.2d 495 (1993)). Reasonable force in self-defense is justified when there is an appearance of imminent danger. State v. Bradley, 141 Wn.2d 731, 737, 10 P.3d 358 (2000). The degree of force used is limited to what a reasonably prudent person would find necessary under the conditions as they appeared to the defendant. Walden, 131 Wn.2d at 474.

Wang argues that the State failed to provide sufficient evidence to refute his claim of self-defense and thus to prove that he intended to cause great bodily harm. A successful claim of self-defense negates criminal intent. State v. Brown, 94 Wn. App. 327, 343 n.4, 972 P.2d 112 (1999) (because a person acting in self-defense is acting lawfully, proof of self-defense negates the element of intent), aff'd, 140 Wn.2d 456, 998 P.2d 321 (2000).

Therefore, the State was required to disprove the self-defense claim beyond a reasonable doubt in order to prove that Wang assaulted Yu with intent to cause great bodily harm. See State v. Grott, 195 Wn.2d 256, 266, 458 P.3d 750 (2020); accord State v. Acosta, 101 Wn.2d 612, 616, 683 P.2d 1069 (1984).

To refute the claim of self-defense, the State produced evidence of the extent of the force that Wang used. The jury saw photographs of blood splatter and broken objects in the home and heard testimony about the extent of Yu's

injuries—including life-threatening head injuries. The jury was therefore free to conclude that even if Yu was the aggressor, the minor injuries suffered by Wang did not justify the force that he used. Further, the jury was entitled to disbelieve Wang's testimony. We defer to the trier of fact on issues of credibility of witnesses and persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Because a rational finder of fact could conclude that Wang did not act in self-defense but, rather, intended to cause Yu great bodily harm, sufficient evidence supports the conviction.

V

Finally, Wang asserts that a chair cannot be a weapon for purposes of the deadly weapon enhancement and that, accordingly, the deadly weapon enhancement must be vacated. We disagree.

Because Wang did not object to the jury instructions or the special verdict form, our review is limited to whether a constitutionally sufficient quantum of evidence supported the deadly weapon enhancement. Evidence is sufficient to support an enhancement if, when viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements beyond a reasonable doubt. Salinas, 119 Wn.2d at 201.

The trial court instructed the jury, that for purposes of the special verdicts, a deadly weapon is "an implement or instrument that has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death." See RCW 9.94A.825. It further instructed that:

> The following instruments are examples of deadly weapons: blackjack, sling shot, billy, sand club, sandbag, metal knuckles, any dirk, dagger, pistol, revolver or any other firearm, any knife having a blade longer than three inches, any razor with an unguarded blade, and any metal pipe or bar used or intended to be used as a club, any explosive, and any weapon containing poisonous or injurious gas.

See RCW 9.94A.825.

Neither party presented any evidence suggesting that a wooden chair was one of the specific items listed. Therefore, the jury had to find beyond a reasonable doubt that the chair used by Wang had the capacity to inflict death and from the manner in which it was used, was likely to produce or could have easily produced death.

Here, the evidence taken in the light most favorable to the State shows that Wang repeatedly struck Yu's head with a heavy wooden chair. Given the size and weight of the chair and the fact that Yu did indeed suffer life-threatening injuries, there was sufficient evidence to allow the jury to find that the chair had the capacity to inflict death and was likely to or could have easily and readily done so. See State v. Barragan, 102 Wn. App. 754, 761, 9 P.3d 942 (2000) (factors relevant to determining whether the object constituted a deadly weapon include the area of the victim's body targeted, the degree of force used, the defendant's stated intent, and the injuries actually inflicted).

That chairs have an ordinary purpose other than producing death does not change this analysis. Wang points to cases holding that motor vehicles are not deadly weapons, State v. Shepherd, 95 Wn. App. 787, 977 P.2d 635 (1999), and State v. Ross, 20 Wn. App. 448, 580 P.2d 1110 (1978), and contends that

14

because chairs are not specifically designed for deadly use, they are outside the scope of the enhancement. However, the cited cases rely on the exclusion of the word "vehicle" in the enhancement statute's definition of deadly weapon although it does appear in the criminal code's definition of deadly weapon. See Shepherd, 95 Wn. App at 793 (citing Ross, 20 Wn. App at 454). Ross explains:

> Had the legislature intended, it could have specifically included motor vehicles within the enhanced penalty statute. Cf. RCW 9A.04.110(6). There is no question that an automobile may be a lethal weapon, but that does not mean it is a deadly weapon within the statute.

20 Wn. App. at 454.

Unlike motor vehicles, chairs do not appear in RCW 9A.04.110(6) and thus their absence from the weapons specifically listed in RCW 9.94A.825 does not indicate a legislative intent that chairs can never fall within the meaning of deadly weapon. Accordingly, Wang's argument to the contrary fails.

Affirmed.

_____
Dwyer, J.

WE CONCUR:

_____     _____
Coburn, J.                           Mann, C.J.

15