# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48166-9-II |
| Respondent, | |
| v. | |
| MARCUS BERNETT THORNTON, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Marcus Bernett Thornton appeals his murder in the second degree with a deadly weapon conviction. We conclude that sufficient evidence supported a first aggressor instruction, the prosecutor did not commit misconduct, and we defer to the new RAP 14.2 on appellate costs. We do not consider whether the first aggressor instruction stripped Thornton of a self-defense claim or whether a violation of Thornton's right to confrontation occurred because he did not raise these issues in the trial court. We affirm.

FACTS

I. TRIAL TESTIMONY

On the afternoon of September 22, 2014, Thornton was on his bike trying to locate John Ware. Thornton let Ware borrow his Bluetooth speaker, but Ware never returned it. Thornton saw Rayneisha Gardner, Ware's girlfriend, flagged her down, and asked where Ware was. Gardner knew Thornton and she told him that she did not know where Ware was.

Gardner asked Thornton whether, several days prior, he had "pulled a knife" on Ware at a mutual friend's house. Report of Proceedings (RP) (Sept. 14, 2015) at 427. Thornton responded

that he did pull a knife on Ware. When Gardner asked why he did not put the knife down and just fight him, Thornton stated that he "wouldn't have pulled a knife if he wanted to fight," meaning "[h]e would stab him" over the speaker Ware had not returned. RP (Sept. 14, 2015) at 428. Gardner offered to pay for the speaker, but Thornton refused, stating that the dispute was about "more than just a speaker." RP (Sept. 14, 2015) at 429.

Thornton told Gardner that he should tag along with her because he knew Ware would come to her. When Gardner refused, Thornton stated it was okay because he could "feel [Ware] in the area" and that he would run into him. RP (Sept. 14, 2015) at 432. The remark gave Gardner a "chill." RP (Sept. 14, 2015) at 432. When she told Thornton not to hurt Ware, he chuckled and said, "Oh, I'm not going to hurt him." RP (Sept. 14, 2015) at 432-33. She stated that if he hurt him, she would tell. Gardner had concerns for Ware's safety, but could not warn him because he did not have a cell phone.

On the same day, Ware's friends, Patrice Sims and her boyfriend Anthony Thomas, were at a gas station to buy cigarettes when Thornton approached them on his bicycle. Thomas knew of Thornton, but Thornton was not from the area.

Sims saw Ware in the distance and pointed him out to Thomas and Thornton. Thornton quickly rode off in Ware's direction. Sims and Thomas followed Thornton because it looked like he was going after Ware. Sims and Thomas caught up to Thornton and saw him and Ware "tussling" on a person's yard. RP (Sept. 16, 2015) at 641. Thornton slammed Ware to the ground. Thornton then got on top of Ware as they continued to fight.

Sims and Thomas saw Thornton holding a knife in his right hand and stabbing Ware while holding his neck. Although Ware carried a bat with him sometimes, Sims and Thomas did not see

him with any weapon during the altercation. A neighbor heard a voice say, "No. No. No." RP (Sept. 8, 2015) at 100. Thornton repeatedly told Ware to beg for his life.

Thomas tried to stop the fight. Thornton got off Ware, picked up a baseball bat, threw it at him, and left the scene on his bike. Holding his side, Ware rose, called out to Thomas, walked towards a house, and fell. Ware suffered stab wounds in his left chest, left back shoulder, and left hip. He died minutes after the stabbing. The fatal wound occurred when the knife went through his lung and heart.

Thornton rode to an acquaintance's residence, a "well known drug house." RP (Sept. 15, 2015) at 573. There, Thornton saw Christopher Scales, a close friend of Ware's. Thornton told Scales that he had an altercation with Ware regarding an electronic item and that he stabbed him. He told Scales that "he got him good" and that Ware would need to go to the hospital. RP (Sept. 15, 2015) at 564. He seemed to be bragging about stabbing Ware for "burning him." RP (Sept. 15, 2015) at 565. Thornton did not appear to be injured and he did not say whether or not Ware tried to hurt him. Thornton asked Scales to retrieve a bloody shirt Thornton had thrown under the front porch. He also asked for a ride out of the area. Scales did not help Thornton and left the house.

Later that evening, Thornton texted several people asking for assistance to return to his home in Illinois. He texted one person, "Baby, I'm in trouble. Help me please . . . I got to leave Washington ASAP. Can't say much more, but got to go now." RP (Sept. 16, 2015) at 765. None of his text messages mentioned what happened with Ware.

The police found a baseball bat in the vicinity of the crime scene, but the knife and Thornton's shirt were never located. The police arrested Thornton two days later. The State

charged him with murder in the first degree with a deadly weapon and murder in the second degree with a deadly weapon. Thornton pleaded not guilty to both charges.

## II.   THORNTON'S TESTIMONY

Thornton claimed he acted in self-defense. He met Ware several days before the incident when Ware asked Thornton to use his Bluetooth speaker. Thornton lent him the speaker and did not see him again until the day of the incident. Thornton admitted to talking with Gardner that day, but denied ever telling her that he pulled a knife on Ware. Thornton said that after Sims pointed out Ware, he only followed him because he wanted to talk to him about the speaker.

When Thornton caught up to Ware, he saw Ware go to the back of a house and pick up a baseball bat. Ware looked at Thornton, said, "What's up?" and ran towards him with the baseball bat "cocked." RP (Sept. 21, 2015) at 825. He hit Thornton in the ribs with the bat and the two began to struggle for the bat. When one of Ware's hands released the bat, Thornton saw Ware wielding a knife with the same hand. As they struggled, Ware tripped and fell onto his back, pulling Thornton down with him. Thornton attempted to get up, but Ware pulled him back down, wanting to fight. When Thornton eventually got up, he saw Ware get up and look for the bat. As Thornton got on his bike and rode off, he turned back to see Ware walking towards a house.

Thornton rode to the drug house, took off his shirt, and hung it on the porch banister. The shirt had no blood on it. He later asked an acquaintance to get his shirt off the porch. He went inside and asked about buying "crystal meth" for someone. RP (Sept. 21, 2015) at 833. Thornton saw Scales at the house, but did not talk to him. He left the house several minutes later so he could purchase methamphetamine at another location.

When Thornton sent out the text messages later that evening, he did not know of Ware's condition. He did not have a knife and did not know Ware was stabbed. Thornton sent messages

4

for help because he thought Ware was trying to find him and he had concerns for his safety. He felt alone and wanted to get out of the area. He denied being the first aggressor and denied stabbing Ware.

III.    MOTION IN LIMINE

Pretrial, the State moved to exclude evidence of Scales's former Crips gang affiliation. Because Ware was also a Crip, Thornton wanted to show Scales's bias by presenting evidence that both Ware and Scales had affiliations with Tacoma's Hilltop neighborhood, a "Crip area," and that they had a "tie" or "bond" between them. RP (Sept. 8, 2015) at 23-24, 29. He anticipated that the State would call witnesses who were friends with Ware as Thornton was fairly unknown in the community.

The trial court ruled that it must apply an ER 404(b) analysis because gang affiliation evidence cannot be offered for a propensity purpose. Even though Thornton argued that the evidence would be offered to show bias, the court decided it needed to consider the evidence's prejudicial effect. It granted the State's motion, ruling that the risk of unfair prejudice greatly outweighed the probative value of proving bias.

Although the judge excluded the gang affiliation evidence, the jury did hear other impeachment evidence including Scales's convictions and his incarceration for attempting to elude a police officer and possession of a stolen vehicle. It also heard that while Scales was in custody, he wrote to the prosecutor's office about information regarding this case. Scales knew that Thornton planned to assert an insanity defense, and Scales was prepared to testify that Thornton was not insane because Thornton was "cognitiv[e]" and "nonchalant" when he came to the drug house. RP (Sept. 15, 2015) at 610-11. Scales did not get a deal for testifying in Thornton's trial, but he nevertheless wanted to testify because Ware "was like family." RP (Sept. 15, 2015) at 582.

The jury also heard that Scales received a deal to be a State's witness in an unrelated case. Thornton cross-examined Scales about his convictions, plea deals, and other potential deals.

IV.     FIRST AGGRESSOR INSTRUCTION

Thornton objected to the trial court giving a first aggressor jury instruction, arguing that it was not supported by the evidence. Thornton did not object to the first aggressor instruction on any other basis. The trial court found that substantial evidence supported the instruction:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

Clerk's Papers (CP) at 110 (Instr. 25). The trial court also instructed the jury on self-defense.

V.      CLOSING ARGUMENTS

During closing argument, the State discussed the conversation between Gardner and Thornton. It stated that Gardner offered to pay for the speaker, but Thornton declined because it was not about the speaker, but the principle. Thornton objected, arguing that the statement was not Gardner's testimony and it was a fact not in evidence. The trial court reminded the jury that the attorneys' comments are not evidence. The State continued, arguing:

> [Thornton] chuckled when [Gardner] told him not to hurt Ware, to which he said, "Oh, I'm not going to hurt him. I'm going to kill him."

RP (Sept. 22, 2015) at 980. Thornton did not object to this statement.

The State also used a PowerPoint presentation in closing. It included slides on evidence admitted at trial and jury instructions, including the elements of the crimes, definitions, and the State's burden of proof. One of the slides showed two admitted photographs of Ware's body at the scene of the crime with a caption that read, "What Does Murder Really Look Like." Supplemental (Suppl.) CP at 171; Br. of Appellant at 8; Br. of Resp't at 23. In reference to the

6

photographs, the State reminded the jurors not to evaluate death based on their exposure to crime drama on TV:

> I do often make reference to TV . . . because we all watch or are affected to some degree by it. . . . That's where we form a lot of our understanding. Frankly, one of the most . . . frequent type of genre or topic you see is law enforcement on television. . . . [W]e never really actually see what it really truly looks like. And Exhibits 37 and 129, which are admitted into evidence, this is what it looks like.

RP (Sept. 22, 2015) at 966.

The jury acquitted Thornton of murder in the first degree, but found him guilty of murder in the second degree with a deadly weapon. Thornton appeals.

ANALYSIS

I.    FIRST AGGRESSOR INSTRUCTION

A.    LOWERING THE STATE'S BURDEN OF DISPROVING SELF-DEFENSE

Thornton argues that the trial court's first aggressor instruction violated his due process rights by impermissibly lowering the State's burden of disproving self-defense beyond a reasonable doubt. He asserts that the use of the word "intentional" in the corresponding Washington Pattern Jury Instructions Criminal (WPIC) lowered the State's burden of proof and precluded a self-defense claim where any intentional act, even a lawful one, may provoke a belligerent response. We decline to address this argument.

At trial, Thornton did not object to the first aggressor instruction on the grounds that he now asserts, i.e., that it lowered the state's burden of disproving self-defense. Instead, he only excepted to it on the basis that insufficient evidence supported the instruction.

We need not consider issues that are raised for the first time on appeal unless the error is manifest and truly of constitutional dimension. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007); RAP 2.5(a)(3). Parties raising constitutional issues [on appeal] must present

7

considered arguments to this court. *State v. Bonds*, 174 Wn. App. 553, 567 n.2, 299 P.3d 663 (2013); RAP 2.5(a)(3). "'[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" *Bonds*, 174 Wn. App. at 567 n.2 (quoting State v. *Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992)). A defendant must identify the constitutional error and show how the error actually prejudiced him and affected his rights at trial. *Kirkman*, 159 Wn.2d at 926-27. If a court determines the claim raises a manifest constitutional error, it may still be subject to harmless error analysis. *Kirkman*, 159 Wn.2d at 927.

The trial court's first aggressor instruction recited, verbatim, WPIC 16.04[1] which the Washington State Supreme Court approved in *State v. Riley*, 137 Wn.2d 904, 908-09, 976 P.2d 624 (1999).[2] *Riley* acknowledged that "[w]hile [a first] aggressor instruction should be given where called for by the evidence, [it] impacts a defendant's claim of self-defense, which the State has the burden of disproving beyond a reasonable doubt." 137 Wn.2d at 910 n.2.

Thornton, however, does not show how giving the first aggressor instruction approved in *Riley* constituted error, let alone manifest error effecting a constitutional right. Although he seems to argue that the instruction is erroneous because it did not require the provoking act to be unlawful, a first aggressor instruction does not require the provoking act to be unlawful. *See State v. Wingate*, 155 Wn.2d 817, 822, 122 P.3d 908 (2005).

Thornton does not make a clear showing that the instruction as applied to the facts of his case was incorrect or that it impermissibly lowered the State's burden of proof. Nor does he show

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.04, at 241 (3d ed. 2008)

[2] A previous version of the instruction used the language "unlawful act" instead of "intentional act." The Washington State Supreme Court affirmed that the language "unlawful act" was unconstitutionally vague. *State v. Wingate*, 155 Wn.2d 817, 822, 122 P.3d 908 (2005).

actual prejudice affecting his rights at trial. Because Thornton cannot show how the error actually prejudiced him, we do not consider the alleged error and limit our review to the evidentiary objection.

B.   SUFFICIENT EVIDENCE TO SUPPORT THE FIRST AGGRESSOR INSTRUCTION

Thornton contends that the trial court erred by giving a first aggressor instruction because Thornton's lawful conduct was insufficient to show that he was the first aggressor. We disagree.

Whether the State produced sufficient evidence to justify a first aggressor instruction is a question of law we review de novo. *State v. Bea*, 162 Wn. App. 570, 577, 254 P.3d 948 (2011). We view the evidence in the light most favorable to the party requesting the instruction. *Wingate*, 155 Wn.2d at 823 n.1 (citing *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000)).

A trial court "properly submits [a first] aggressor instruction where (1) the jury can reasonably determine from the evidence that the defendant provoked the fight; (2) the evidence conflicts as to whether the defendant's conduct provoked the fight; or (3) the evidence shows that the defendant made the first move by drawing a weapon." *State v. Anderson*, 144 Wn. App. 85, 89, 180 P.3d 885 (2008) (citing *Riley*, 137 Wn.2d at 909-10). The court errs in submitting the instruction if the evidence shows the defendant used only words to provoke the fight. *Anderson*, 144 Wn. App. at 89.

At trial, the parties presented conflicting evidence as to whether Thornton's acts provoked the response by Ware. The State submitted evidence showing that Thornton was actively looking to stab Ware, and once he spotted Ware, Thornton chased him down. Thornton submitted evidence that he only wanted to speak to Ware and that Ware charged at him with a bat and pulled a knife.

Recognizing the presence of conflicting evidence, the trial court gave the first aggressor instruction.

The trial court followed the directive in *Riley* that such an instruction is appropriate if there is conflicting evidence as to whether the defendant's conduct precipitated the fight. 137 Wn.2d at 910. Based on the conflicting evidence, a jury could reasonably infer that, within the context of Thornton having pulled a knife on Ware days before his death, Thornton actively searched for Ware, aggressively approached him, and attacked him. A reasonable jury could find that Thornton's acts were intentional and reasonably likely to provoke a belligerent response from Ware. We, therefore, conclude that in light of the conflicting evidence as to whose actions precipitated the fight, the first aggressor instruction was proper.

II.      PROSECUTORIAL MISCONDUCT

A.      LEGAL STANDARDS

To prevail on a claim of prosecutorial misconduct, the defendant must show that in the context of the entire record and the circumstances of trial, the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). Failure to object to an improper remark waives the error, unless the remark is so flagrant and ill-intentioned that an instruction to the jury would not have cured the prejudice. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *State v. Emery*, 174 Wn.2d 741, 761, 278 P.3d 653 (2012) (quoting *Thorgerson*, 172 Wn.2d at 455).

10

In closing argument, prosecutors have wide latitude to argue reasonable inferences from the evidence. *Thorgerson*, 172 Wn.2d at 448. However, a prosecutor should "'not use arguments calculated to inflame the passions or prejudices of the jury.'" *Glasmann*, 175 Wn.2d at 704 (quoting AM. BAR ASS'N, STANDARDS FOR CRIM. JUSTICE std. 3-5.8(c) (2d ed. 1980)). Prosecutors may use multimedia resources in closing arguments to summarize and highlight relevant evidence. *State v. Walker*, 182 Wn.2d 463, 476, 341 P.3d 976 (2015). Prosecutors, however, may not present altered versions of admitted evidence to support the State's theory of the case. *Walker*, 182 Wn.2d at 478. Highly prejudicial images may sway a jury in ways that words cannot; such imagery may, therefore, be difficult to overcome with an instruction. *Glasmann*, 175 Wn.2d at 707.

### B. POWERPOINT SLIDE

Thornton argues that he did not receive his right to a fair trial because the State showed images of Ware's bloodied body during closing argument with a caption equating the images to what murder looked like, thereby inflaming the jury's passion and prejudice. Assuming without deciding that the State used improper captions with its PowerPoint presentation during closing, we conclude that an instruction to the jury would have cured any prejudice.

During closing argument, the State displayed a PowerPoint slide with two photographs that had been admitted into evidence showing Ware's body at the crime scene. However, the State added a caption stating, "What Does Murder Really Looks Like." Supp. CP at 171; Br. of Appellant at 8; Br. of Resp't at 23. In reference to the photographs, the State reminded the jurors not to evaluate death based on their exposure to crime drama on TV. Thornton did not object to the slide.

11

The undisputed evidence showed Ware received multiple stab wounds that caused his death. Even if we assume the caption was inflammatory, it was not so flagrant and ill-intentioned that no instruction could have cured the prejudice. The jury had already seen the admitted photos of Ware's body, and given the overwhelming evidence presented at trial a curative instruction to ignore the caption would have cured any asserted prejudice. We, therefore, conclude that there was no prosecutorial misconduct.

C.    TESTIFYING TO FACTS NOT IN EVIDENCE DURING CLOSING ARGUMENTS

Thornton also argues that the prosecutor impermissibly testified to facts not in evidence when the prosecutor stated that Thornton said he was going to kill Ware. He argues that because the misstatement went directly to the primary factual issue at trial—whether Thornton intended to hurt Ware—there was a substantial likelihood that the misconduct affected the outcome of his case. We disagree.

At trial, the evidence showed that Thornton pulled a knife on Ware. Thornton stated that he would not have brought a knife if he wanted to fight. He told Gardner that he could feel Ware in the area and knew he would run into him, a statement that gave Gardner "a chill." RP (Sept. 14, 2015) at 432. When Gardner told Thornton not to hurt Ware, he chuckled and stated, "Oh, I'm not going to hurt him." RP (Sept. 14, 2015) at 432-33. Gardner said she would tell if he hurt Ware, and testified that she was concerned for Ware after having had the conversation with Thornton.

During closing arguments, the prosecutor stated, "[Thornton] chuckled when [Gardner] told him not to hurt Ware, to which he said, 'Oh, I'm not going to hurt him. I'm going to kill him.'" RP (Sept. 22, 2015) at 980. Thornton did not object to the prosecutor's remark. Given the context of the evidence and Ware's subsequent injuries, the prosecutor argued a reasonable

inference from the evidence that Thornton's intent was not merely to fight Ware, but to stab or kill him.

Thornton fails to show how the remark had a substantial likelihood of affecting the verdict and how it was so flagrant and ill-intentioned that no instruction could have cured any prejudicial effect. Therefore, his argument fails.

III.    RIGHT TO CONFRONTATION

Thornton argues that his right to confrontation was violated when the trial court prohibited him from cross-examining Scales about being a member of the Crips gang. He argues that being prohibited from exposing Scales's bias was prejudicial to his case. Because Thornton cannot show manifest error affecting a constitutional right, we decline to decide the issue.

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees a defendant the opportunity to confront witnesses against him or her through cross-examination. *State v. Fisher*, 165 Wn.2d 727, 752, 202 P.3d 937 (2009). A defendant has the right to confront witnesses against him with bias evidence so long as the evidence is minimally relevant. *Fisher*, 165 Wn.2d at 752.

The trial court has authority to set boundaries regarding the extent to which the defendant may delve into the witness' alleged bias based on concerns such as harassment, prejudice, confusion of the issues, witness' safety, or interrogation that is repetitive or only marginally relevant. *Fisher*, 165 Wn.2d at 752. We uphold a trial court's ruling on the scope of cross-examination absent a finding of manifest abuse of discretion. *Fisher*, 165 Wn.2d at 752.

Under RAP 2.5(a)(3), an appellant may not raise a claim of error on appeal that was not raised at trial, unless he or she demonstrates that the alleged error is manifest and the error is truly of constitutional dimension. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). An error

is of constitutional dimension if the asserted claim, if correct, implicates a constitutional interest as compared to another form of trial error. *State v. Grimes*, 165 Wn. App. 172, 186, 267 P.3d 454 (2011). An alleged error is manifest if the error had practical and identifiable consequences at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011). We place ourselves in the shoes of the trial court when determining if an alleged error had practical and identifiable consequences. *O'Hara*, 167 Wn.2d at 100.

In *State v. O'Cain*, 169 Wn. App. 228, 248, 279 P.3d 926 (2012), Division One of this court held that a clear line of decisions requires that a defendant raise a confrontation clause claim at or before trial, or lose the benefit of the right. (Citing to *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed 610 (2011); *State v. Jasper*, 174 Wn.2d 96, 271 P.3d 876 (2012); *State v. Hayes*, 165 Wn. App. 507, 265 P.3d 982, *review denied*, 176 Wn.2d 1020 (2013)). However, as stated in *Melendez-Diaz*, States may adopt procedural rules governing objections and the issue is whether RAP 2.5 is such a procedural rule. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313-14 n.3, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

In *State v. Hart*, we noted that our Supreme Court has not overruled case law which allows defendants to raise an alleged confrontation violation for the first time on appeal if they satisfy the requirements of RAP 2.5(a)(3). 195 Wn. App. 449, 458 n.3, 381 P.3d 142 (2016). We stated that, notwithstanding the sound reasoning in *O'Cain*, 169 Wn. App 228, we would follow *State v. Hieb*, 107 Wn.2d 97, 104-08, 727 P.2d 239 (1986). *Hart*, 195 Wn. App. at 458 n.3. Therefore, we analyze Thornton's claim under RAP 2.5(a)(3).

Pretrial, Thornton unsuccessfully argued that evidence of Scales' past affiliation with the Crips could be used as bias evidence to establish a "tie" or "bond" between Scales and Ware. RP

(Sept. 8, 2015) at 24, 29. After conducting an ER 404(b) analysis, the trial court excluded the evidence. Although evidence of Scales's past affiliation with the Crips was excluded, other evidence was introduced at trial to establish Scales's bias and the "tie" between Ware and Scales. The jury heard evidence that Scales worked with the State in the past in exchange for a deal on his sentence. It heard about Thornton's convictions and that he was in jail when he unsuccessfully attempted to get a deal for testifying against Thornton in this case. The jury also heard that Scales wanted to testify, even though he did not get a deal, because Ware "was like family." RP (Sept. 15, 2015) at 582.

Here, the jury heard evidence of numerous reasons why Scales's testimony might be biased. Thornton fails to show how, in light of the other impeachment evidence elicited at trial, excluding evidence of Scales's past affiliation with the Crips violated his right to confrontation. The trial court properly exercised its discretion in excluding the evidence. Further, Thornton makes no argument showing that the alleged constitutional error had practical and identifiable consequences at trial. Because the error was not preserved and Thornton makes no argument or citations to authority showing how excluding evidence of Scales's gang affiliation—in light of other bias evidence admitted at trial—was manifest error, we do not decide the issue.

IV.    APPELLATE COSTS

Lastly, Thornton argues that, should the State prevail on appeal, we should not require him to pay appellate costs. He opposes appellate costs in light of *State v. Sinclair*, 192 Wn. App. 380, 367 P.3d 612, *review denied*, 185 Wn.2d 1034 (2016), asserting that he does not have the ability to pay because he is indigent. Under the newly revised provisions of RAP 14.2, a commissioner of this court will consider whether to award appellate costs under the rule if the State decides to file a cost bill and if Thornton objects to that cost bill. We defer to the commissioner's decision.

15

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Maxa, A.C.J.

Lee, J.