# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  57375-0-II |
| Respondent, | |
| v. | |
| VERNON JEROME BORJA, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Vernon Borja was convicted of second degree assault (with a deadly weapon) and second degree unlawful possession of a firearm.  At his trial, the trial court admitted (1) video surveillance footage from a hotel parking lot depicting Borja pointing a gun at a woman in a sport utility vehicle (SUV) and (2) a 911 call recording in which the caller stated he heard a gunshot. Testimony was also solicited from law enforcement witnesses, without objection from defense counsel, about victim behavior in domestic violence cases, latent bruising of assault victims, and whether an assault with a firearm could occur even if the gun was not fired.  And finally, during deliberations, the trial court allowed the jury to watch the surveillance video in the jury room.

Borja appeals his convictions.  Borja argues the trial court abused its discretion in admitting the video and the 911 call, and in allowing the jury to view the video in the jury room.  Borja also claims ineffective assistance of counsel when his counsel failed to object to the law enforcement testimony listed above.  Finally, Borja challenges the sufficiency of the evidence for his second degree assault conviction and contends cumulative errors resulted in an unfair trial.

We disagree and affirm Borja's convictions.

FACTS

I. BACKGROUND

On April 6, 2021, around 1:11 p.m., an employee of the Travelodge Hotel in Fife called 911 to report an incident occurring in the hotel parking lot. The caller told the dispatcher that he thought he heard a gunshot and saw a male (later identified as Borja) "cock" a gun and approach a vehicle. Clerk's Papers (CP) at 6 (internal quotation marks omitted). The caller described the person as wearing a backwards hat and a white shirt and accompanied by two other males. The following conversation occurred:

> Dispatcher: 911, what are you reporting?
> Caller: Yeah, I just saw someone in the parking lot pull out a gun and cock it.
> Dispatcher: At what address?
> Caller: Oh, he shot that sh[*]t. [Recites address.]
> Dispatcher: Did they shoot it at somebody?
> Caller: I think so.
> Dispatcher: Did you see the person with the gun?
> Caller: Yeah, a dude in a white shirt. . . .
> Dispatcher: How many minutes ago?
> Caller: Right now. He just shot that sh[*]t. . . . I couldn't see, but I heard it. I saw him run up and cock it. Like a minute before.
> . . . .
> Dispatcher: Is he white, Black, Asian, or Hispanic?
> Caller: I think he's Hispanic. . . .

Ex. 40, at 00:01 to 01:01.

About two minutes after the start of the 911 call, police officers arrived at the Travelodge while the caller remained on the line with 911. (The caller told the dispatcher that he saw a police

officer arrive, around two minutes after the 911 call began.)  Officer Goff was the first to arrive, around 1:13 p.m.  Officer Goff immediately saw the three men in the parking lot.  Upon seeing the officer, two of the men turned and ran to a hotel room, but the third (Borja) walked quickly in a different direction.  Officer Goff ordered Borja to stop and to show his hands, but Borja instead ran to a nearby car before eventually running into a hotel room, different from the room with the two other men.

More officers arrived on-scene as the 911 caller continued describing the events playing out in the parking lot.  Borja eventually exited the hotel room, and he was placed under arrest.

Officer Pomeroy, one of the responding officers, contacted the front desk later that afternoon and viewed, with other officers, the Travelodge's surveillance video from security cameras in the parking lot.  A copy of the video they watched was made and given to one of the officers for entry into law enforcement's evidence for the case.

The video depicted Borja, wearing a backwards hat and a white shirt and holding a large pistol, approaching an SUV with a woman in the back seat.  At around 1:11 p.m., with two other men nearby, Borja aimed the gun at the woman multiple times, then appeared to strike either her or the interior of the vehicle with his fist.  Borja then appeared to aim the gun at the woman again.  Borja began walking away from the vehicle but stopped and hit the SUV hard with the underside of the gun's handle.  Borja then handed the gun to one of the other men.  The magazine from the gun dropped on the pavement, and the man picked it up.  The video then showed that at around 1:13 p.m., Officer Goff arrived on-scene, which appeared to cause Borja and the other men to disperse.

3

The police continued their investigation. The police obtained a warrant to search the hotel room into which the two other men fled. The search uncovered a hand gun that was concealed under a mattress. The gun's magazine had damage consistent with being dropped on the pavement. And the SUV had a 4-inch dent in the area where the video showed Borja hitting it. Officers did not find any evidence that any shots had been fired at the scene.

Officers, including Officer Goff, spoke with the woman from the SUV. The woman appeared upset but did not have any visible injuries. The woman did not otherwise cooperate with the investigation and declined to make a written statement.

## II. TRIAL

Borja was charged with one count of second degree assault, one count of malicious mischief, and one count of second degree unlawful possession of a firearm. The second degree assault was alleged as a domestic violence crime against an intimate partner because the woman in the SUV (hereafter, the victim) was alleged to be Borja's girlfriend.

The case proceeded to trial.

### A. ADMISSION OF 911 CALL

Before the State began its case-in-chief, the trial court heard motions in limine. The State argued that the 911 call recording should be admissible under the theory that it was an excited utterance or a present sense impression. Defense counsel argued that neither exception to the hearsay rule applied because the caller was not sufficiently excited and because some of the statements related to the caller's memory of past events, rather than recounting what was occurring contemporaneously.

After listening to the call, the trial court ruled that a portion of the recording was admissible. The trial court explained that the statements contained both excited utterances and present sense impressions, respectively, because the caller made the call "specifically asking for help on the fact he heard a gunshot" and because he then proceeded to describe the events as they occurred. Verbatim Rep. of Proc. (VRP) at 27. But the trial court ruled that the final portion of the recording was inadmissible at the point when the dispatcher began asking about what had previously occurred, deciding that the caller's statements became more responsive to investigatory-type questions.

Consistent with this pretrial ruling, an edited version of the 911 call recording was played to the jury during trial.

B. TESTIMONY

The testimony at trial included several of the officers who responded to the Travelodge. The victim did not testify.

1. Officer Pomeroy

The State first called Officer Pomeroy as a witness. Officer Pomeroy testified about the events that he saw when he arrived and what he observed from viewing the surveillance video. The State asked Officer Pomeroy where the other two men who were with Borja had gone, and Officer Pomeroy began his response with,

> So, reviewing the video that I watched, they went all different directions. Most of them went between cars as Sergeant Goff was approaching them, and then a lot of them went out of . . . the camera angle.

VRP at 215. The State then asked Officer Pomeroy questions about the video:

Q. So to back you up there. You reviewed surveillance footage?

A. Yes.

Q. And how did you gain access to this footage?

A. I contacted the front desk.

Q. And did they show you portions of what had just occurred?

A. Yes.

VRP at 215. At that point, Officer Pomeroy watched the video again in the court room on a laptop provided by the State, but outside the view of the jury, to ensure the CD disk the State wanted admitted into evidence contained the correct surveillance video. Officer Pomeroy initialed the disk. Officer Pomeroy confirmed the video depicted the Travelodge and carried date and time stamps for April 6, 2021, beginning at 1:06 p.m. He also separately confirmed he began responding to the Travelodge at 1:12 p.m. The State asked if the video was a "fair and accurate representation of what occurred on April 6, 2021," and Officer Pomeroy answered yes. VRP at 220. When the State offered the CD for admission at that point, the trial court asked the State to first lay more foundation.

The State then asked Officer Pomeroy if the video he viewed in the court room was the same video that he viewed in the Travelodge lobby on the day of the incident:

Q. And what you observed on that disk is the same footage when you were given -- when you first looked at it inside the hotel lobby?

A. Yes.

VRP at 222. The State again offered the video for admission into evidence.

6

Before the trial court ruled on the offer, defense counsel was given the opportunity to voir dire Officer Pomeroy. Defense counsel asked if he was the actual officer to whom the Travelodge employee had given the CD disk. Officer Pomeroy answered no and said he did not know which officer had received the CD disk. From this, defense counsel objected to admission, arguing that the proper foundation had not been laid because there was no evidence about who had copied the video onto the CD, how the video was created, or which officer had received the CD.

The trial court ruled that the proper foundation had been laid. The trial court stated that the defense's argument based on chain of custody went to "weight, not admissibility." VRP at 223. The surveillance video was then played for the jury.

The State further questioned Officer Pomeroy about the events that he witnessed once he arrived, including observing Borja's victim at the scene. The State asked Officer Pomeroy whether, "[b]ased on [his] training and experience," he had interacted with victims of domestic violence, and Officer Pomeroy answered yes. VRP at 279. The State then asked if domestic violence victims "always act[ed] or present[ed] themselves in standard ways when . . . contact[ed] . . . in an investigation." VRP at 279. Officer Pomeroy answered no, and when the State asked him to explain further, he stated,

> Sometimes they're angry with us that we're there, sometimes they try to avoid us as much as possible, sometimes they're crying and want to participate in the investigation; just depends on the person.

VRP at 279. Defense counsel did not object to this testimony.

The State also asked Officer Pomeroy about the investigation and whether a firearm generally needed to be actually fired for an assault with a firearm to occur:

Q. Based on your training and experience, when you're investigating whether assault with a firearm occurred, does the firearm need to be fired?

A. No, sir.

Q. Can you please explain?

A. If you use a firearm to strike somebody or use that firearm any other way, it's still considered. . .

Q. Thank you. . . . No further questions.

VRP at 280 (first ellipses in original). Defense counsel did not object to the line of questioning.

2. Officer Goff

The State called Officer Goff to testify and also asked him about his training and experience related to domestic violence crimes. The State then asked if domestic violence cases were investigated differently than other cases. Officer Goff answered,

Oftentimes, in domestic violence type of calls, victims will be the original reporters of a crime but not necessarily be cooperative with an investigation.

VRP at 400-401. Defense counsel did not object to the question or Officer Goff's answer.

During cross-examination, defense counsel asked Officer Goff about his interactions with the victim at the scene. Defense counsel asked if the victim had any bruises or other injuries, and Officer Goff answered that he did not observe any injuries.

On redirect, the State asked Officer Goff if injuries were present in every incident of assault, and Officer Goff answered no. The State asked why, and Officer Goff responded,

There [are] instances where maybe an injury is not visible yet or could later be, or maybe where even the type of injury isn't immediately going to be visible or immediately apparent, could be like bruising or something that hasn't occurred yet.

VRP at 438. Defense counsel did not object to this testimony.

3. Detective Kenyon and Detective Volkman

The State called two other responding officers, Detective Kenyon and Detective Volkman, who were asked about the investigation and the requirements for the crime of assault with a firearm. The State asked Detective Kenyon whether, after watching the surveillance video, it mattered if a shot was fired. The following exchange took place:

Q. Your basis for or your investigation in this case after watching the surveillance video does whether a shot -- does it matter whether a shot was fired or not?

A. No.

Q. Why not?

A. Even though that was initially what was reported, we found what we determined through probable cause to be a crime had occurred other than just a report of a shot being fired into the air.

Q. Based on your training and experience, does someone need to fire a firearm to assault another with it?

A. No.

VRP at 497. Defense counsel did not object.

The State exchanged a similar line of questioning with Detective Volkman but asked him specifically whether Borja approaching the vehicle with a firearm constituted a crime:

Q. Based on your training and experience, does someone need to fire a firearm at another person to assault them with it?

A. No.

Q. After reviewing the video in this case, did your investigation expand beyond what was initially reported, which was of shots fired?

A. Yes, it did.

Q. And why?

A. Due to seeing Mr. Borja approaching the gray SUV while holding what appeared to be a firearm.

Q. Based on your training and experience, did that constitute a crime?

A. Yes, it did.

  Q. Regardless of whether or not a shot was fired?

  A. Correct.

VRP at 384. Defense counsel also did not object to this line of questioning.

  C. SIDEBAR REGARDING JURY'S ABILITY TO VIEW VIDEO DURING DELIBERATIONS

  Near the end of the testimony and outside the presence of the jury, defense counsel asked the trial court about the access the jury would have to the surveillance video during deliberations. Defense counsel argued that the jury should not have the video freely available to them in the jury room to view it frame-by-frame because that was "not what was presented to the jury during testimony." VRP at 458. If the jury wanted to view the video again during deliberations, defense counsel argued they should view it only in the courtroom.

  The trial court expressed concern about giving the jury the CD and a playback device to view the video in the jury room because it could not prevent access to other items on the computer. The trial court also said it was concerned that the jury might give the video "undue weight" compared to other evidence if given unlimited access.[1] VRP at 460. But the trial court explained that it believed it was discretionary whether it decided to provide the jury with the video in the jury room. The trial court stated,

> I will not be giving them a video player. They can view the video as much as they want. They can look at any other piece of evidence they want, but this seems to be a junior detective jury, and I'm not going to give them a video player to simply watch a video over and over and over again.

VRP at 461.

---

[1] The trial court's concerns were potentially rooted in an earlier incident of potential juror misconduct when two jurors, while on a break, approached Detective Volkman in a hallway and suggested that they had additional questions for him. Those jurors were released from jury service after that incident.

D.  DISMISSAL OF DOMESTIC VIOLENCE ALLEGATION AND MALICIOUS MISCHIEF CHARGE

Following the State's case-in-chief, Borja made two motions: (1) he moved to dismiss the component of the second degree assault charge that alleged it was committed against an intimate partner; and (2) he moved to dismiss his malicious mischief charge.  The trial court granted both motions.  The trial court ruled there was no first-hand testimony that Borja and the victim were in a domestic relationship and that the State did not prove that Borja had damaged the property of another person.

E.  JURY INSTRUCTION ON ASSAULT

Following the close of evidence, the trial court read the final jury instructions to the jury.  The instructions related to second degree assault (instructions 6 and 7) read as follows:

> A person commits the crime of assault in the second degree assault when he or she assaults another with a deadly weapon.

CP at 33.

> An assault is an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 34.

F.  CLOSING ARGUMENT, JURY VERDICT, AND MOTION FOR A NEW TRIAL

The case moved to closing arguments.  During its closing argument, the State did not mention any testimony about the behaviors of domestic violence victims, any injuries on the victim (latent or otherwise), or whether a shot needed to be fired for an assault with a firearm to have occurred.

During deliberations, the jury requested to see the surveillance video two times but apparently had issues being able to view the video together and not discussing its contents in front of court staff. Thereafter, notwithstanding the trial court's earlier statements that it would not give the jury access to the video in the jury room, the trial court apparently changed its mind and, without consulting with the parties, allowed the jury to take the video back to the jury room.

The jury returned verdicts of guilty on the second degree assault and second degree unlawful possession of a firearm charges.[2] The jury also found, via a special verdict form, that Borja did possess a firearm in the commission of his crime of second degree assault.

After the verdict, the State and defense counsel learned that the jury was able to view the surveillance video in the jury room. Borja moved for a new trial, arguing that Borja's right to a fair trial was violated based on the jury's unfettered access to the video.

Over a month later, the trial court held a hearing on Borja's motion. Defense counsel started by characterizing the jury's request to see the video as a jury question:

> Your Honor, in over . . . 25 years [of] trying criminal cases, what happened in this case has never occurred before where a jury question was not brought before the parties. When the jury asked to see the video in the back room, in the jury deliberation room, that was a question because the fact that it had been agreed upon by the parties that if the video was going to be viewed, it had to be viewed in the courtroom.

VRP at 615-16. The trial court disagreed with the defense's characterization and explained its position on the events that occurred:

---

[2] Borja stipulated that for the purposes of the unlawful possession of a firearm charge, he had been previously convicted of a felony.

> Counsel, let me correct the record.
>
> What happened was counsel requested the video not be allowed to be taken back there. The State opposed that motion and the State specifically asked it be allowed to go back. Based upon *Castellanos*[3] and my viewing of *Castellanos*, I attempted to accommodate the defense's request for the video not to be viewed continually by the jury, but it was very clear that the video was admitted evidence, and it could be reviewed by the jury at any time they requested. And to be clear, the jury requested to view the video. I made it very clear to counsel, and it is on the record that they would not be called back if they asked to view the video; they would be allowed to view the video in court with court staff in order to ensure their ability to do so.

VRP at 616. The trial court again stated that its decision whether to allow the jury to view the video in the jury room was in its discretion and denied Borja's motion for a new trial.

Borja appeals.

ANALYSIS

I. ADMISSION OF SURVEILLANCE VIDEO

Borja argues the trial court erred in admitting the surveillance video because it was not properly authenticated. We disagree.

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). An abuse of discretion occurs when the decision was manifestly unreasonable or based on untenable grounds or reasons. *Id.* We also consider whether a reasonable judge would rule as the trial judge did. *Id.*

Before admitting an item into evidence, the party moving to admit the item must show that the item is what it purports to be. ER 901(a). Physical evidence connected to the commission of a crime is only admissible if it is "satisfactorily identified and shown to be in substantially the

---

[3] *State v. Castellanos*, 132 Wn.2d 94, 935 P.2d 1353 (1997).

same condition as when the crime was committed." *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984). "Evidence that is unique and readily identifiable may be identified by a witness who can state that the item is what it purports to be." *State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002).

For authentication purposes, courts treat videos like photographs, which Washington courts have a policy of liberally admitting. *State v. Sapp*, 182 Wn. App. 910, 914, 332 P.3d 1058 (2014); *see State v. Newman*, 4 Wn. App. 588, 593, 484 P.2d 473, *review denied*, 79 Wn.2d 1004 (1971). To lay the foundation to admit a video into evidence, a witness must be "able to give some indication as to when, where, and under what circumstances the [video] was taken, and that the [video] accurately portray[s] the subject or subjects illustrated." *State v. Tatum*, 58 Wn.2d 73, 75, 360 P.2d 754 (1961). If these two criteria are met, the video recording is admissible at the trial court's discretion. *Newman*, 4 Wn. App. at 593.

A video recording does not need to be authenticated by a witness who was present for its creation. *Sapp*, 182 Wn. App. at 915-16. "Rather, the trial court may consider any information sufficient to support the prima facie showing that the evidence is authentic." *State v. Williams*, 136 Wn. App. 486, 500, 150 P.3d 111 (2007). In *Sapp*, the court held that a trial court did not abuse its discretion when it determined a witness was able to authenticate photographs and videos, despite not being present when they were taken, because the witness had personal knowledge of the timeframes in which the items were taken and could identify the subjects of imagery. 182 Wn. App. at 916-17. The court recognized that some visual media may "speak for itself" without specific authentication of what is depicted. *Id.* at 916.

Here, Borja contends Officer Pomeroy's testimony was insufficient to authenticate the video. Borja acknowledges that the officer testified that the video was a "fair and accurate representation" of the events, but he argues the testimony fails to sufficiently establish the chain of custody for the CD and fails to authenticate the earliest portions of the video because he was not yet present on the scene. Appellant's Opening Br. at 44 (internal quotation marks omitted).

But Officer Pomeroy's testimony established more than merely his belief that the surveillance video was an accurate representation of the events. Officer Pomeroy also testified that the investigation led him to contact the front desk of the Travelodge to see if there was surveillance footage available. The officer then viewed, at that time, the surveillance footage provided by the employee. Later, in the court room, Officer Pomeroy watched the video again on the CD and confirmed that the video in the courtroom was the same video footage that he watched at the Travelodge. It was this same CD that was ultimately admitted as an exhibit, showing that the video was in "the substantially same condition" as when Officer Pomeroy originally viewed it. *See Campbell*, 103 Wn.2d at 21.

Although it is true that Officer Pomeroy did not know which employee made the CD copy of the video or which police officer actually took possession of the CD for evidence, his testimony is still sufficient to make a prima facie showing of authenticity; Officer Pomeroy confirmed the video was recorded on the day of the incident because that was the date he originally watched the video footage (which is also supported by the video's date and time stamps), he confirmed the video was recorded by the Travelodge security cameras, and the video was preserved because of the incident involving Borja. This testimony gives information about "when, where, and under what circumstances" the video was taken. *See Tatum*, 58 Wn.2d at 75.

15

Additionally, having confirmed the CD contained the same video he saw at the Travelodge, the officer's testimony was sufficient to show the video was what it purported to be. *See Roche*, 114 Wn. App. at 436. The fact that Officer Pomeroy did not personally observe all of the events depicted does not make the video inadmissible, especially given the extremely short duration of video footage that precedes the officer's arrival (mere minutes). *See Sapp*, 182 Wn. App. at 915-16 (rejecting theory that images must be authenticated by a person who was present at their creation). Demanding firsthand confirmation of every minute of video by a witness who was present would be inconsistent with our state's policy of liberally admitting this type of evidence. *See Newman*, 4 Wn. App. at 593. As the trial court said, this could go to the weight of the evidence, but not to the trial court's discretion to admit the evidence.

Because the State met the threshold for the video's prima facie authentication, the trial court therefore did not abuse its discretion in admitting the video into evidence.

## II. JURY'S VIEWING OF SURVEILLANCE VIDEO

Borja also argues the trial court abused its discretion by allowing the jury to view the surveillance video in the jury room. Borja argues that the trial court's decision may have allowed the jury to put undue weight on the video compared to other evidence when there were no restrictions in place to minimize the prejudicial effect the video may have had. We disagree.

Decisions involving evidentiary issues "lie largely within the sound discretion of the trial court and will not be reversed on appeal absent a showing of abuse of discretion." *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997). A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court. *Id.*

16

Generally, when the jury deliberates, it "shall take with it . . . all exhibits received in evidence . . . ." CrR 6.15(e). The decision to allow a jury to take admitted evidence to the jury room is left to the sound discretion of the trial judge, who must bear in mind the potential for overemphasizing an exhibit's importance. *State v. Frazier*, 99 Wn.2d 180, 190, 661 P.2d 126 (1983). An exhibit may go with the jury to the deliberation room when it " 'bear[s] directly on the charge and [is] not unduly prejudicial.' " *Castellanos*, 132 Wn. App. at 98 (quoting *Frazier*, 99 Wn.2d at 189). " 'When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists.' " *Id.* at 100 (quoting *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615 (1995)). But once an exhibit is in the jury room for deliberations, the jury may generally use it as the jury sees fit. *Id.* at 97.

Here, the issue is whether the surveillance video (1) bears directly on the charge and (2) was not unduly prejudicial. If those requirements are met, the trial court did not abuse its discretion.[4]

First, the surveillance video did clearly bear on Borja's charges. The video depicted Borja, in possession of a gun, pointing it at his victim multiple times and then striking either the victim or the inside of the vehicle with his fist. Those actions were the very basis for Borja's charges for

---

[4] We understand the frustration of defense counsel when the trial court changed its decision on the video without consulting the attorneys. We recognize the trial court may have believed it acted consistently with its understanding that the parties knew they would not be called back to the courtroom if the jury wanted to see the video. But absent clear agreement from the parties, we strongly discourage trial courts from making any decisions related to jury deliberations or jury communications without consulting the parties. Nevertheless, Borja has provided no argument that this action by the trial court, by itself, constituted error. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

second degree assault based on an assault with a deadly weapon and for second degree unlawful possession of a firearm.

Second, while the video was prejudicial to Borja, it was not unduly so. The video was a plain and unaltered depiction of the events that occurred in the Travelodge parking lot and did not include sound. The video showed the jury a visual depiction of the events, and given its unaltered and silent character, the risk of eliciting an emotional response in the jurors during their deliberations was minimized.

Both of the requirements for evidence to be allowed in the deliberation room with the jury were met here. Even if we may have made a different decision than the trial court, we cannot say that it was outside the trial court's "sound discretion" to allow the jury to view the surveillance video in the jury room. *See Frazier*, 99 Wn.2d at 190.

III.  ADMISSION OF 911 CALL

Borja argues the trial court erred in admitting the 911 call into evidence. Borja argues that the 911 call was not admissible as an excited utterance or present sense impression. We disagree.

As stated above, we review the trial court's decision to admit or exclude evidence for an abuse of discretion and consider whether a reasonable judge would have ruled as the trial judge did. *Gunderson*, 181 Wn.2d at 922.

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial, that is offered as evidence to prove the truth of the matter asserted. ER 801(c). Unless an exception or exclusion applies, hearsay is inadmissible. ER 802.

Two such exceptions to hearsay include if a statement is either an "excited utterance" or a "present sense impression." ER 803(a)(1), (2). An "excited utterance" is "[a] statement relating

to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). "[T]he 'key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.' " *State v. Brown*, 127 Wn.2d 749, 758, 903 P.2d 459 (1995) (second alteration in original) (internal quotation marks omitted) (quoting *State v. Strauss*, 119 Wn.2d 401, 416, 832 P.2d 78 (1992)). A "present sense impression" is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." ER 803(a)(1). "The admissibility of a statement of a present sense impression is based upon the assumption that its contemporaneous nature precludes misrepresentation or conscious fabrication by the declarant." *State v. Hieb*, 39 Wn. App. 273, 278, 693 P.2d 145 (1984), *rev'd on other grounds*, 107 Wn.2d 97, 727 P.2d 239 (1986).

Here, the trial court admitted the first part of the 911 call as an excited utterance. As the trial court explained, the caller was seeking help because he thought he had just heard a gunshot about a minute prior and had witnessed the events in the parking lot. According to the caller, he saw Borja "cock" the gun he was holding about a minute before the call, and when the dispatcher asked how recently the gun shot occurred, the caller stated, "Right now, he just shot that sh[*]t." Ex. 40, at 0:00:01-0:01:01. We find no error in the trial court's conclusion that the caller's demeanor appears to have still been under the influence of witnessing Borja "cock" the gun and hearing what sounded like a gunshot. It was not an abuse of discretion to admit this portion of the recording as an excited utterance.

19

Then, as the trial court found, the caller began describing the events that unfolded as they were happening—the police arriving and Borja and the two other males running away. The caller was recorded saying,

Oh, there's a police officer pulling up right now.

. . . .

The police officer is pulling right up on them. They're walking. I can't see the license plate. He just – he's walking away from the police officer. Walking towards the front. Walked toward the [car]. He got, he got inside a grey [car].

Ex. 40, at 2:00 to 2:27. Because the caller was recounting the events in real-time as they transpired, we find no error in the trial court's conclusion that these statements were present sense impressions.

Borja argues neither hearsay exception should apply to the 911 call because the call was a false report. Borja suggests the call was deliberately false because, first, the caller said a shot was fired but the police investigation did not uncover any evidence of an actual shot, and, second, the caller identified that Borja was Hispanic when he is actually of Pacific Islander descent.

It is true that the caller was likely wrong about the gunshot and Borja's ethnicity. But Borja makes too much of these mistakes. Borja offers no evidence that the caller was intentionally fabricating any of the facts. Indeed, the caller used equivocal language when describing both the gunshot and Borja's ethnicity. The caller said he did not see a shot, he only heard it. (It is plausible that the caller mistook Borja aggressively hitting the side of the SUV (and leaving a 4-inch dent) for the sound of a gunshot.) And the caller's statement about Borja's ethnicity followed a question from the dispatcher that gave the caller only four choices. ("Is he white, Black, Asian, or Hispanic?" Ex. 40, at 0:56: to 0:1:02.) Answering this question with, "I think he's Hispanic," can

hardly be considered, as Borja urges, indicative of a deliberately false report. Ex. 40, at 0:55 to 1:02.

Considering the 911 call as a whole, Borja's argument that these mistakes mean the hearsay exceptions of excited utterances and presence sense impressions do not apply is utterly unpersuasive. We conclude the trial court did not abuse its discretion in admitting the 911 call statements under these hearsay exceptions.

## IV. SUFFICIENCY OF THE EVIDENCE

Borja next challenges the sufficiency of the evidence for his second degree assault conviction. Borja argues that there was not sufficient evidence to show that the victim had the required state of mind to fulfill all elements of the crime, especially since the victim did not testify. We disagree.

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). We view the evidence in the light most favorable to the State and "determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014).

A sufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014).

One of the ways a person commits assault in the second degree is when they assault another with a deadly weapon. RCW 9A.36.021(1)(c). As Borja was charged, one of the elements of the

crime is that the act "in fact creates in another a reasonable apprehension and imminent fear of bodily injury . . . ." CP at 34; *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 725, 543 P.3d 821 (2024).

Here, assuming the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence, there was sufficient evidence from which the jury could find all of the required elements of the crime, including the victim's state of mind. The surveillance video depicted Borja pointing a firearm at his victim two times, hitting either the inside of the SUV or the victim with his fist, and then pointing the gun at the victim again. A reasonable inference is that having had a gun pointed at her several times in fact created "reasonable apprehension and imminent fear of bodily injury" in the victim. Borja's sufficiency of the evidence claim fails.

V. INEFFECTIVE ASSISTANCE OF COUNSEL

Borja argues that he received ineffective assistance of counsel for several instances where counsel failed to object to the police officers' testimony—specifically, about the behaviors of domestic violence victims, an officer's experience with latent bruising after an injury, and statements that a firearm does not need to be fired for an assault with a firearm to occur. We disagree that counsel's failure to object was ineffective assistance of counsel.

A. LEGAL PRINCIPLES

A defendant possesses a right to effective assistance of counsel in criminal proceedings. *Strickland v. Washington*, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To show that they received ineffective assistance of counsel, a defendant must show (1) that their attorney performed deficiently and (2) that the deficiency prejudiced the defendant. *Id.* at 687;

*In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). We engage in a strong presumption that counsel's performance was reasonable. *Id.*

When an ineffective assistance of counsel claim is based on counsel's failure to object, the defendant must show the objection would have been likely to succeed to show deficient performance. *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). "[I]f defense counsel fails to object to inadmissible evidence, then they have performed deficiently . . . ." *Id*. (emphasis omitted). But "[a] few or even several failures to object are not usually cause for finding that an attorney's conduct has fallen below the objective standard of conduct." *Id.* at 250.

" 'Decisions on whether and when to object to trial testimony are classic examples of trial tactics.' " *State v. Davis*, 17 Wn. App. 2d 264, 273, 486 P.3d 136 (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)), *review denied*, 198 Wn.2d 1008 (2021). If counsel's actions can be characterized as legitimate trial strategy or tactics, performance is not deficient. *State v. Bertrand*, __ Wn.3d __, 546 P.3d 1020, 1030 (2024).

To show prejudice, the defendant must demonstrate a reasonable probability that the outcome of the proceeding would have been different if counsel had not performed deficiently. *State v. Johnson*, 12 Wn. App. 2d 201, 210, 460 P.3d 1091 (2020), *aff'd*, 197 Wn.2d 740, 487 P.3d 893 (2021).

B. DOMESTIC VIOLENCE TESTIMONY

Borja argues that his counsel was ineffective for failing to object to the State's questioning about the behaviors of domestic violence victims.[5]  Borja argues he received ineffective assistance because the testimony was inadmissible for multiple reasons, including that the testimony was more prejudicial than it was probative because it invited speculation about Borja being an abusive boyfriend.  We disagree.

Borja cannot show prejudice—the second *Strickland* prong—because the evidence was brief and not overly emphasized to the jury.  Because Borja's charged crimes were originally alleged as domestic violence offenses against an intimate partner, the State questioned Officer Pomeroy and Officer Goff about the challenges of investigating cases involving domestic violence and how those victims may act toward police.  But when the trial court dismissed the domestic violence allegations after the State rested, the relevance of this evidence dissipated.  Accordingly, the State made no further mention of either the testimony or intimate partner violence in its closing argument.

Moreover, Borja cannot show prejudice because of the strong evidence of guilt.  The primary evidence to support Borja's second degree assault charge was the surveillance video, which depicted Borja pointing a gun at his victim multiple times, striking her or the interior of the

---

[5] The State responds to Borja's ineffective assistance of counsel claims related to the officers' testimony by characterizing the testimony as lay witness testimony that was admissible under ER 701.  Although it is irrelevant to our consideration of Borja's arguments, we disagree with the State's characterization; the officers appeared to be providing testimony based on their training and experience that may have been admissible as expert testimony under ER 702.  *See State v. Sanders*, 66 Wn. App. 380, 385-86, 832 P.2d 1326 (1992) (a testifying police officer may act as an expert witness when the testimony "does not concern sophisticated or technical matters" and the testimony was based on "the witness' training, experience and observations on the job").

SUV, and pointing the gun at the victim a third time. Considering this video evidence, Borja cannot show that if his defense counsel had objected to the police officers' brief testimony about the general demeanors of domestic violence victims and the intricacies of those investigations, there would have been a reasonable probability that the outcome of the trial would have been different. *See Johnson*, 12 Wn. App. 2d at 210. Borja's claim for ineffective assistance of counsel regarding the domestic violence testimony fails.

C. LATENT BRUISING TESTIMONY

Borja next argues that his counsel was ineffective for failing to object to testimony about latent bruising. Borja argues the testimony was inadmissible because it was speculative, irrelevant, unfairly prejudicial, and beyond the scope of lay testimony. We disagree that Borja's counsel was ineffective for not objecting to this testimony.

During the defense's cross-examination of Officer Goff, defense counsel asked whether he saw any bruises or other injuries on the victim, and Officer Goff answered no. In redirect, the State responded to this defense questioning by asking Officer Goff if injuries are always visible, and Officer Goff explained,

> There [are] instances where maybe an injury is not visible yet or could later be, or maybe where even the type of injury isn't immediately going to be visible or immediately apparent, could be like bruising or something that hasn't occurred yet.

VRP at 438.

Here, too, Borja cannot show prejudice under the second *Strickland* prong. Again, the State never mentioned this testimony in its closing argument and the evidence of Borja's guilt was strong. Indeed, the State's theory of the case was based on the creation of a reasonable apprehension and imminent fear of bodily injury, not an actual injury to the victim, making this

testimony ultimately inconsequential to jury's consideration. Considering this testimony was merely responding to a line of defense questioning and was never mentioned by the State again, it is unlikely the jury was somehow unfairly influenced by the testimony. Thus, Borja cannot show a "reasonable probability that the outcome of the trial would have been different" had defense counsel objected to this testimony. *See Johnson*, 12 Wn. App. 2d at 210. Borja's claim for ineffective assistance of counsel regarding latent bruising testimony fails.

D.  ASSAULT TESTIMONY

Finally, Borja argues that he received ineffective assistance because his counsel failed to object to officers' statements about whether a firearm needed to be actually fired for an assault with a firearm to occur. Borja argues this testimony was impermissible as a legal conclusion of Borja's guilt on the assault charge and failure to object to the evidence was therefore ineffective assistance. We disagree because Borja has not shown he was prejudiced.

Under ER 704, a witness may testify as to matters of law but may not give legal conclusions. Improper legal conclusions include testimony that a particular law applies to the case or that the defendant's conduct violated a particular law. *Hyatt v. Sellen Constr. Co.*, 40 Wn. App. 893, 899, 700 P.2d 1164 (1985).

Borja again fails to meet the second *Strickland* prong by showing that his counsel's failure to object to the officers' testimony prejudiced him. Borja challenges the State's questioning of three officers, arguing that the implication of the State's testimony was that Borja had committed an assault. The three police officers (Officer Pomeroy, Detective Kenyon, and Detective Volkman) were all asked, based on their training and experience, whether a firearm needed to be actually fired for an assault with a firearm to have occurred. Each officer answered that a shot did

26

not need to have been fired. Both Officer Pomeroy and Detective Kenyon stopped short of making any additional statements that indicated that *Borja* committed a crime despite absence of a shot being fired. Volkman, however, took it one step further and confirmed, in response to the State's question that from his training and experience, that he thought what he saw constituted a crime.

Assuming this testimony was objectionable, any prejudice is belied, again, by the strong evidence of Borja's guilt. The jury watched the video of Borja pointing a gun at his victim multiple times, and the jury instruction on assault identified that an assault occurred if the victim had "a reasonable apprehension and imminent fear of bodily injury even though [Borja] did not actually intend to inflict bodily injury." CP at 34.

Moreover, like the evidence of latent bruising, whether a shot was fired was irrelevant to the State's theory of assault (the evidence of a gun being pointed at the victim is enough to show a reasonable apprehension and imminent fear of bodily injury), and the State never mentioned the testimony in its closing argument. Again, this suggests it is unlikely the jury would have been unfairly influenced by the testimony. Thus, even if defense counsel had objected, Borja has not shown a reasonable probability that the outcome of his trial would have been different. *See Johnson*, 12 Wn. App. 2d at 210.

Borja fails to prove any of his ineffective assistance of counsel claims.

VI. CUMULATIVE ERROR

Borja argues the cumulative error doctrine warrants reversal of his convictions. We disagree.

27

The cumulative error doctrine provides that a defendant may be entitled to a new trial when cumulative errors result in a fundamentally unfair trial. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). The cumulative error doctrine may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). This doctrine does not apply when "the errors are few and have little or no effect on the outcome of the trial." *Id.*

Here, Borja fails to show any errors related to the admission of challenged evidence (the surveillance video and 911 call) or sufficiency of evidence occurred. And looking at the evidence and record as a whole, we see no potential that any accumulation of potential errors made Borja's trial fundamentally unfair. The admitted surveillance video provided the jury with strong evidence of Borja's guilt, and any errors that occurred therefore would have had little to no effect on the outcome of Borja's trial, even when those potential errors are considered together. Borja's cumulative error claim fails.

## CONCLUSION

The trial court did not abuse its discretion in admitting the surveillance video, allowing the jury to view the video in the deliberation room, or admitting the 911 call as an excited utterance and present sense impression. And Borja fails to show that there was not sufficient evidence for his second degree assault charge or make a showing of ineffective assistance of counsel. Nor were there cumulative errors in Borja's trial that made his trial fundamentally unfair. We affirm.

No. 57375-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

GLASGOW, J.